PYROMATICS, INC., APPELLEE, *v.*
PETRUZIELLO ET AL., APPELLANTS.

(No. 44888—Decided
January 27, 1983.)

*Cavitch, Familo & Durkin Co.,
L.P.A.,* and *Mr. Michael C. Cohan,* for appellee.

*Demer & Demer Co., L.P.A.,* and *Mr.
John A. Demer, Jr.,* for appellants.

PARRINO, J. This appeal arises from a grant of injunctive relief and the award of money damages to plaintiff-appellee, Pyromatics, Inc., based on its verified complaint alleging unlawful use and disclosure of various trade secrets and other proprietary information by defendants-appellants, Michael J. Petruziello, Romanco, Inc., Glen A. Siders, William R. Erzen, Charles S. Blackwell and Raymond S. Woodcock.[1]

Pyromatics, Inc. was incorporated in June 1975. At that time, it bought the entire quartz products division of Sherwood Refractories, Inc., a subsidiary of TRW, Inc., including patents, production technology, recorded technical information and data and equipment. The principal shareholders in Pyromatics were former employees of Sherwood. The business of Sherwood's quartz division, and of Pyromatics since its inception, has been the manufacture of fused and powdered quartz products for industry. The fused quartz products, which are the focus of this lawsuit, are targeted to a limited market; investment costs for production are high. Fused quartz cores, as

---

[1] The judgment below awarded compensatory and punitive damages against Romanco and Petruziello, breach of contract damages against Blackwell, a permanent injunction against all defendants, and ordered Romanco to render an accounting. Appellants do not specifically argue the breach of contract damages against Blackwell; accordingly, pursuant to App. R. 12(A), any alleged error in regard to those damages is disregarded on the instant appeal.

used in investment casting, comprise a major portion of the production of fused quartz products. These cores are manufactured by use of a redraw machine. The trial court's findings of fact may be quoted for a brief description:

"The redraw machine is a device in which quartz rods or tubes are fed at a controlled speed by means of wheels into a flame that maintains a regulated temperature on the surface of the quartz rod so that the quartz becomes viscous. The viscous quartz is cooled as it emerges from the heat center and by means of a second set of wheels is drawn·or extruded from the heat center so that it cools into a rod or tube of smaller but similar configuration to the feed item. The goal of this process is to produce a smaller rod or tube with very fine dimensional tolerances. That smaller rod or tube is then further cut, ground, bent, beaded and fused with other rods or tubes to fine tolerances for use in casts for metal products. The casts primarily produce metal products for the jet engine industry. The function of the small quartz rod or tube is to enable the jet engine piece to have very small air passages that will facilitate cooling the engine."

The particular designs of the redraw machine and the production techniques used are claimed by Pyromatics to be trade secrets and proprietary information.

Defendant-appellant Michael Petruziello also worked for Sherwood Refractories, Inc. at the time its quartz division was purchased by Pyromatics. He became one of the first employees of Pyromatics in 1975. Petruziello worked with the redraw machine and had access, over the years, to production costs, yield rates and other operating information. Petruziello held a number of positions with Pyromatics during his tenure there and was familiar with all the equipment and production techniques used by Pyromatics in manufacturing fused quartz. He had also had contact with the major customers, particularly General Electric Company ("GE").

In 1979, Petruziello left his employment with Pyromatics and caused Romanco, Inc. to be formed. Romanco's only business has been the production of fused quartz products; Romanco is in direct competition with Pyromatics for the limited target market for these products.[2] Romanco manufactures its fused quartz cores by use of a redraw machine, built by Petruziello, and a production process which are indistinguishable in their essential components from those at Pyro-

---

[2] The following findings of fact by the trial court are helpful to a full understanding of the case:

"17. The jet engine industry is the primary market for quartz cores made with small dimensions to close tolerances. The total number of customers for small dimension quartz cores as specialized in by Pyromatics is approximately twenty-five. Any Pyromatics production employee of a few years' service could easily learn and remember the major customers through his normal work and be able to contact them without notes or memoranda.

"18. The most significant product made by Pyromatics since 1977 was a set of cores for a jet engine blade manufactured by General Electric Company (hereafter GE) and known

as the CF6-50 project. Although GE contracts with suppliers on a sole source basis only where no other reasonable competitive product of adequate quality is available, Pyromatics was the sole source of cores for the CF6-50 blade prior to 1980. Until Romanco entered the market place, the only known manufacturers of small-diameter quartz cores with fine tolerances were two other small manufacturers in Cleveland, Industrial Quartz and a business owned by John Crisay * * *. Only Industrial Quartz had attempted to compete for the CF6-50 quartz core contract prior to Romanco."

It should be further noted that Industrial Quartz (IQ) has been unsuccessful in its attempt to produce the CF6-50 cores in an economically profitable manner.

matics. In 1980, Romanco was able to successfully underbid Pyromatics on the GE CF6-50 core project.[3]

Defendants-appellants Siders, Erzen, Blackwell and Woodcock are all former employees of Pyromatics and either current or former employees of Romanco.

Following a two-week trial to the court, the court rendered its opinion and extensive findings of fact and conclusions of law. The findings of fact are described more fully under the appropriate assignment of error; the conclusions of law, in pertinent part, read:

"1. The unpatented design and details of Pyromatics redraw machine that was in use when the individual defendants worked for Pyromatics are trade secrets of Pyromatics.

"2. Operating costs, prices, and yields of Pyromatics in making and selling redrawn quartz rods and tubes are trade secrets of Pyromatics.

"3. Procedures utilized by Pyromatics to cut, bend, bead, weld, and measure redrawn quartz cores and rods are in the public domain and their combination into a single process does not involve significant novelty to constitute a trade secret.

"4. By virtue of their employment relationship, all of the individual defendants owed a duty to Pyromatics not to disclose to outsiders or to use for personal advantage the trade secrets of Pyromatics.

"5. By written employment contract, all individual defendants had a duty not to disclose to outsiders nor use at any time, even after leaving the employ of Pyromatics, the trade secrets of Pyromatics except on behalf of Pyromatics. Such duty, however, did not preclude any individual defendant except Charles Blackwell from initiating a competing business or working for a competitor of Pyro-

matics so long as such defendant did not utilize trade secrets of Pyromatics.

"6. By written contract, Charles Blackwell had a duty not to engage any competing business to Pyromatics for a period of two years after he left the employ of Pyromatics.

"7. Michael Petruziello breached his duties under written contract to Pyromatics by using confidential information as to yields, prices, and operating costs of Pyromatics to enable Romanco to compete with Pyromatics.

"8. Charles Blackwell breached his duty not to engage in a competing business to Pyromatics by becoming an employee of Romanco.

"9. Romanco had a duty not to utilize information which it knew was obtained from another person in breach of a duty not to disclose that information. It violated that duty by using the information improperly obtained or disclosed by Petruziello.

"10. Romanco and Petruziello, by breaching their duties not to use confidential information obtained through a trust relationship, caused Pyromatics to lose $25,060.00 in profits on sales to ICL and AETC, $9,408.00 as a reduced price on a CF6-50 contract of 4,800 sets of cores let in December 1980, and $18,182.50, representing the further profit Pyromatics would have earned if it gained 60% of that December, 1980, contract from General Electric.

"11. Pyromatics has not proven by a preponderance of the evidence that at any time after 1979, it would have been a sole source supplier for General Electric on CF6-50 parts, that expenditures for capital equipment were losses of any sort, and that overstocking would not have resulted with competition from Romanco.

"12. The violations of duty by Romanco and Petruziello were intentional and wilful, and these violations which resulted in the breaches of duty were done with deliberate and malicious intent to injure Pyromatics. For such intentional,

---

[3] See footnote 2. Romanco has also produced at least one other core in direct competition with Pyromatics.

wilful, and malicious conduct, the court awards $32,000.00 as punitive damages."

Appellants filed a timely appeal and have assigned four errors which shall be addressed seriatim.

## I

"The trial court erred in denying the defendants' request for a jury trial."

The right to a jury trial is not absolute. Where a plaintiff seeks primarily equitable relief with attendant and incidental money damages neither party is entitled to a trial by jury. *Converse v. Hawkins* (1877), 31 Ohio St. 209; *Rowland v. Entrekin* (1875), 27 Ohio St. 47; *Harden Chevrolet Co. v. Pickaway Grain Co.* (C.P. 1961), 92 Ohio Law Abs. 161 [27 O.O.2d 144].

In the instant case the right of the plaintiff to damages depended upon its right to have enjoined the activities of the defendants. The damage recovery sought was incidental to the main relief of preventing further use of plaintiff's trade secrets by the defendants. The denial of a jury trial was a proper action.

Appellants also argue under this assignment that even if the equitable claims of plaintiff-appellee were paramount, the trial court erred in not permitting a bifurcated trial whereby the damage issue would have been tried to a jury. Although such a decision would have been a proper exercise of discretion, the court was under no duty to bifurcate the trial. The first assignment of error is overruled.

## II

"The trial court erred in concluding that the plaintiff corporation possessed any trade secrets which were misappropriated by defendants in violation of a legal duty to plaintiff corporation."

This assignment of error is not well-taken.

The gravamen of plaintiff's complaint was that the individual defendants, all former employees of plaintiff, used confidential information concerning the manufacture of fused quartz products that they had garnered through their employment to engage in unfair competition with plaintiff.

A trade secret is defined by R.C. 1333.51(A)(3):

" 'Trade secret' means the *whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, or improvement,* or any business plans, financial information, or listing of names, addresses, or telephone numbers, *which has not been published or disseminated, or otherwise become a matter of general public knowledge. Such* scientific or technical information, design, process, procedure, formula, or improvement, or any business plans, financial information, or listing of names, addresses, or telephone numbers *is presumed to be secret when the owner thereof takes measures designed to prevent it, in the ordinary course of business, from being available to persons other than those selected by the owner to have access thereto for limited purposes.*" (Emphasis added.)

The necessary inquiry, then, is twofold: (1) whether plaintiff has shown that its redraw machine and its production methods are protectible trade secrets, and (2) whether plaintiff has taken substantial steps to keep such information secret.

There is a labyrinth of law concerning trade secrets and unfair competition. (See, *e.g., Arthur Murray Dance Studios v. Witter* [C.P. 1952], 62 Ohio Law Abs. 17, wherein pages of citations may be found.) The factors most often used by trial courts to determine whether or not a trade secret exists were succinctly set forth by the Kansas Supreme Court in *Koch Engineering Co. v. Faulconer* (1980), 210 U.S.P.Q. 854, 861:

"* * * factors to be considered in recognizing a trade secret are: (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, i.e., by the employees, (3) the

precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information."

These factors were considered by the trial court in its evaluation of the evidence.

The following salient findings of fact support the trial court's determination; a close review of the extensive trial record shows that all are amply supported by the record:

"7. The redraw machine used by Pyromatics was built at Sherwood in 1968. Sherwood had obtained rough sketches of another such machine from someone who had apparently seen the machine in use elsewhere as a result of his employment. Two Sherwood employees worked from those rough sketches in consultation with the provider of the sketches to build, over a four or five month period, the redraw machine that Pyromatics ultimately acquired from Sherwood. Sherwood then made adaptations on a trial and error basis to 'debug' the machine before using it in marketable production. Of particular importance was learning how to regulate the rates of feed and draw of the rods or tubes and controlling the heating and cooling of the rod. Obviously, differences in rates of feed, draw, and temperature would greatly affect the dimensions of the ultimate product.

"8. Information concerning rates of feed, draw, heat, and cooling have regularly been recorded and preserved by Sherwood and Pyromatics on each particular product made with the redraw machine.

"* * *

"10. Pyromatics required Petruziello, Erzen, Siders and Woodcock to sign an employment agreement containing the following language:

" 'I, _____, the Employee, will have access to, may become familiar with confidential information of the Company, including but not limited to trade secrets, formulae, patterns, devices, secret inventions, processes, computations of data and information, records and specifications which are owned by the Company and used in the operations and/or development of the Company's business. The Employee shall not disclose any of said confidential information to any individual or entity whatsoever, directly or indirectly, nor use said confidential information in any way during the term of employment hereunder or thereafter, except as requested in the course of his employment on the Company's behalf.

" '* * *

" '3. All files, records, documents, drawings, specifications, equipment, and similar items (including copies of any such item) relating or pertaining to the Company's business, or experimental work carried on by the Company, whether prepared by the Employee or otherwise coming into his possession shall be and remain the exclusive property of the Company and shall not be removed.'

"That employment agreement did not contain a separate non-competition agreement.

"* * *

"12. As a further means of maintaining secrecy of its operations, Pyromatics did not allow any individuals outside the company, including customers, into the area where it made quartz cores. The reason for that was that the production techniques were relatively simple and could easily be copied, especially by someone with engineering knowledge or glass blowing background.

"13. Some aspects of Pyromatics core-making process were disclosed in patent No. 3,652,248 filed June 8, 1970, by Ted A. Loxley, now President of Pyromatics, together with Walter Barber,

a founder of Pyromatics, and John M. Webb. The patent disclosed that the process, subsequently, used by Pyromatics involved

" '* * * [f]eeding the (quartz) rod vertically between motor driven feed rolls, directing flames radially inwardly against the periphery of the rod to heat the glass to a drawing temperature above 3,000° F., maintaining a tension on the rod to draw it and reduce its diameter at least 70 percent, characterized in that jets of cooling air are directed radially inwardly against the periphery of the heated glass about 1 inch to about 2 inches below the flame and above the zone of constant diameter to reduce the length of the tapered neck substantially and thereby provide better dimensional control.'

"The application further stated: 'The process of the inventors involves a simple change in the conventional glass redrawing process * * *.'

"14. Not disclosed in the patent application nor otherwise known to persons outside Pyromatics were the particular rates of feed and draw of the quartz rods or tubes, fuel mixtures, and rates of fuel application in maintaining temperatures on the tubes and rods at the heat center, and the amounts of air flow and pressure used in the quenching process when making a particular product. That information was recorded and kept secret by Pyromatics.

"15. The quartz core operation at Pyromatics involves a maximum of twenty-five management and production personnel, one of whom operates the redraw machine. Only management personnel and the operator of the redraw machine know the data generated in the redraw process. Any production employee however, is in a position to observe and remember the entire physical process of production.

"16. Through the experience of production mistakes, Sherwood developed some very simple techniques for determining bow in the rods and measuring diameters and out-of-roundness. Production experience also led to adaptations in the composition of the feed and draw wheels. By an accident associated with attempting to repair ordinary wear and tear on the redraw machine before a new machine could be put into service, Pyromatics made an adaptation in the drive system for the feed and draw wheels of the redraw machine. By trial and error, it developed a special heat-resistant coating for the draw wheels of the redraw machine that facilitates a uniform draw and minimizes contamination. Pyromatics also used a principle which it valued highly in applying heat when bending a core to a particular angle. Its production process also includes cleaning and inspection stages which it deems important to maintaining quality. Knowledge of all of these processes and adaptations was available to all production personnel. The information was kept secret from outsiders, but no efforts were made to conceal it from employees nor to notify them that the information should not be disclosed."

In his testimony, Petruziello stated that he had no formal training in chemistry. He stated that he had basically copied Pyromatics' set up but that he felt such was just state of the art. He said that the information concerning rates of feed and temperature and such information was generally available, although he could not pinpoint specific references to fused quartz technology. Petruziello also stated on cross-examination, however, that Romanco uses strict non-disclosure employee agreements, and that Romanco has taken steps to shield its equipment from competitors and customers. It is clear from the record that Petruziello gathered the information he needed to build a redraw machine and begin production of fused quartz cores from his employment with Pyromatics and its predecessor, Sherwood.

Where the judgment of a trial court is supported by competent, credible evi-

dence going to all the essential elements of the case, a reviewing court will not reverse that judgment as against the manifest weight of the evidence. *C. E. Morris Co.* v. *Foley Construction Co.* (1978), 54 Ohio St. 2d 279 [8 O.O.3d 261]. The determination of whether or not plaintiff's machine and production process are trade secrets and whether or not defendants misappropriated such information are matters of fact. Since defendants learned the information necessary to compete with plaintiff while working for plaintiff under an agreement not to disclose trade secrets, the trial court's determination was proper. *Vitro Corporation of America* v. *Hall Chemical Co.* (C.A. 6, 1958), 254 F.2d 787.

The application of the prohibition against using trade secrets to compete with one from whom such secrets were gained in a confidential relationship requires a careful balancing of the need to protect trade secrets and the goal of free and vigorous competition. We are convinced, however, that the trial court properly evaluated all the evidence before it and reached a just decision.

Accordingly, appellants' second assignment of error is overruled.

### III

"The trial court erred in granting plaintiff corporation a permanent injunction."

This assignment of error, argued in two parts, is without merit. The first prong of appellants' argument is that the record does not show irreparable harm to the plaintiff resulting from defendants' actions. The facts are clear that before Romanco entered the field, Pyromatics had little serious competition. The fused quartz field is a small one and Pyromatics had a firm foothold in it. Had defendants entered the field through their own entrepreneurship, plaintiff would have no legal protection against their competition. However, where competition arises solely from the misappropriation of trade

secrets, injunction is the proper remedy. *B. F. Goodrich Co.* v. *Wohlgemuth* (1963), 117 Ohio App. 493 [24 O.O.2d 290]; *Kodekey Electronics, Inc.* v. *Mechanex Corp.* (C.A. 10, 1973), 486 F.2d 449; *Sperry Rand Corp.* v. *A-T-O, Inc.* (C.A. 4, 1971), 447 F.2d 1387; *Vitro Corp. of America, supra.* See, also, 1 Milgrim, Trade Secrets, Section 7.08[1].

As a second attack on the injunctive relief, appellants argue that plaintiff has not entered the court with "clean hands" and is further estopped by laches. The "clean hands" position is not argued and the record does not support the position that plaintiff unduly delayed in bringing suit. There is no indication that plaintiff acquiesced in appellants' appropriation of its trade secrets and business before suit was instituted.

The third assignment of error is overruled.

### IV

"The trial court erred in awarding damages to plaintiff corporation."

Under this assignment, appellants argue that the award of punitive damages was unwarranted and that the compensatory damages were speculative. Neither position is well-taken.

Punitive damages may be awarded in a trade secret case where the evidence shows that the defendant acted willfully and intentionally and with malicious intent. *W. R. Grace & Co.* v. *Hargadine* (C.A. 6, 1968), 392 F.2d 9; *Sperry Rand Corp.* v. *A-T-O, Inc., supra.*

The evidence below indicates that Petruziello deliberately copied the production processes of Pyromatics using information he had learned from his confidential relationship with Pyromatics. He was aware of the cost figures used by Pyromatics and caused Romanco to underbid them on the GE CF6-50 project which Petruziello knew to be one of Pyromatics' major jobs. He also bid on other major projects for known customers of Pyromatics. His contact at GE was a

product of his prior relationship with Pyromatics. We do not decide the issue of punitive damages *de novo,* but find the evidence sufficient to support the trial court's award.

The award of compensatory damages was properly calculated to reimburse plaintiff for the profits it lost based on the award of GE CF6-50 contracts to Romanco and the reduction of price on other projects made necessary by Romanco's competition which would not have existed but for the misappropriation of trade secrets.[4] *Sperry Rand Corp.* v. *A-T-O, Inc., supra.* The trial court disregarded plaintiff's prayer for speculative damages based on overstocking and the cost of money and awarded only those damages which could be proved.

Finding no reversible error in the judgment below, the decision of the trial court is affirmed.

*Judgment affirmed.*

CORRIGAN, P.J., and NAHRA, J., concur.

---

[4] The calculations for the damages are set forth in conclusion of law No. 10 which is reprinted *supra.*