**UNIROYAL GOODRICH TIRE COMPANY, Plaintiff,**

v.

**William L. HUDSON, a/k/a Willie L. Hudson, Defendant.**

No. 93–CV–74346–DT.

United States District Court, E.D. Michigan, Southern Division.

Dec. 27, 1994.

Edward M. Kronk and Phillip C. Korovesis, Butzel Long, Detroit, MI, for plaintiff.

Courtney E. Morgan, Jr. and Angela J. Nicita, Chambers, Steiner, Mazur, Ornstein & Amlin, Detroit, MI, for defendant.

*OPINION AND ORDER INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING A TRIAL ON THE MERITS*

ZATKOFF, District Judge.

## I. INTRODUCTION

Plaintiff brought this diversity action against defendant seeking a permanent injunction pursuant to two (2) employee secrecy and non-compete agreements signed by the defendant. The case proceeded to trial on November 21, 1994, the Honorable Lawrence P. Zatkoff, presiding. For the reasons that follow, judgment will be entered for plaintiff.

## II. BACKGROUND

### A. Factual Background

Plaintiff Uniroyal Goodrich Tire Company (and its predecessor, Uniroyal) (hereinafter "UGTC") employed the defendant William L. Hudson ("Hudson") from 1966 to 1991. During that time, Hudson executed two company secrecy and non-compete agreements, one in 1987 and one in 1991. (Plaintiff's Exhibits 1 & 3). Three sections of the 1991 agreement are the focus of this suit. (Plaintiff's Exhibit 3). First, the preamble paragraph defines confidential information, trade secrets, and proprietary matters as "Information." Paragraph One (1) of the agreement prohibited Hudson from using or divulging any UGTC trade secrets, confidential, or proprietary information during his employment with UGTC or after he left the company, unless specifically authorized by UGTC. Paragraph Six (6) of the agreement prohibited Hudson, for a period of two years, from associating with or becoming employed by any individual, firm, or corporation involved in tire technology which was: i) competitive, or foreseeably competitive, with UGTC; or ii) the production of the product would require Hudson to possess or have had access to Information; or iii) the new employment would require Hudson to reveal or base his judgment upon or use any UGTC Information.

After leaving UGTC, Hudson was hired by Kurt Scientific, Inc., as a tire consultant. Kurt Scientific, Inc., provides consulting services and expert witnesses in personal injury and products liability actions. One lawsuit in which Hudson testified was the *Papazian* case. Two other lawsuits for which Kurt Scientific hired Hudson were in the state court of Georgia. UGTC was the defendant in all three cases. In the Georgia cases, Hudson was listed as an expert witness, and testified via video deposition at the trial.

UGTC filed interrogatories seeking disclosure of expert witnesses and their expected testimony in the two Georgia actions (the cases were consolidated and are hereinafter referred to as the *"Ford"* cases). The responses indicated to UGTC that Hudson's testimony would conflict with the secrecy and non-compete Agreements he had signed with UGTC.

UGTC alleges that Hudson was using and/or divulging trade secrets, confidential information, or proprietary matters in the course of his work in the *Papazian* and *Ford* cases, in violation of the 1987 and 1991 Agreements.

### B. Procedural Background

On October 18, 1993, this Court entered a Temporary Restraining Order preventing Hudson from testifying in the deposition as an expert witness in the *Ford* cases against his former employer. On November 4, 1993, this Court entered a preliminary injunction enjoining Hudson from using or disclosing,

without the express consent of UGTC, any information:

a) regarding condition codes used by UGTC in documenting adjusted or return tires from the field, adjustment claim forms or rates in general or relating to a particular model tire and its family of tires in the *Ford* litigation;

b) regarding UGTC employees, company policies, practices procedures, documents, inspection and adjustment processes, and his knowledge about the UGTC Tuscaloosa, Alabama Plant;

c) regarding trade secrets and confidential and proprietary information to anyone for any purpose.

The preliminary injunction did not apply to Hudson's disclosure of any of the above information in an official proceeding of a court of record.

On March 15, 1994, this Court found Hudson in Contempt of the Court's Preliminary Injunction Order. Hudson was found in Contempt for using and reviewing adjustment data, UGTC studies and other matters which constitute UGTC Information outside of court in the *Ford* litigation. Hudson has appealed this Court's finding of contempt to the Sixth Circuit.

Defendant's Motion to Dismiss or for Summary Judgment on grounds of waiver and laches was denied by the Court on June 28, 1994, as was a separate Motion for Summary Judgment. The latter motion asked the Court to revisit four arguments previously made by the defendant: a) defendant did not breach the contract by using or disclosing UGTC Information and UGTC could not establish a legally cognizable injury; b) UGTC's interpretation of the contract violates public policy and UGTC's interests could be protected by protective orders; c) information disclosed by defendant was not considered trade secret or confidential; and d) the contracts no longer bind Hudson because they expired after two years. The Court declined to reexamine these arguments.

In a September 22, 1994, ruling, the Court held that the issue of First Amendment protection is not before the Court. In the same order, the Court granted UGTC's request to close the courtroom at trial. Finally, this Court ordered that separate trials be held on defendant's counter-complaint, which alleged he should be reimbursed for the injunctive effect of the Agreements, and plaintiff's claim for attorneys fees and costs pursuant to ¶ 11 of the 1991 Agreement, if each is still necessary at the conclusion of the trial.

## III. APPLICABLE LAW

■ In this breach of contract action, the parties do not dispute that the 1987 and 1991 Agreements constituted valid contracts. The 1987 Agreement between the parties is governed by Michigan law; the 1991 Agreement is governed by Ohio law. Michigan and Ohio define a trade secret in essentially the same manner. Michigan law defines a trade secret as follows:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*Hayes–Albion Corp. v. Kuberski*, 421 Mich. 170, 181–82, 364 N.W.2d 609 (1984).

Ohio Revised Code § 1333.51 *et seq*, the Uniform Trade Secrets Act, defines a protectable trade secret as follows:

"Trade secret" means information, including the whole or any portion of or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent and economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Revised Code § 1333.61(D).[1]

■ Both states look to the same six factors to determine whether particular information is protected as a trade secret. The factors are set forth in *Kuberski*, 421 Mich. at 182, 364 N.W.2d 609, and *Pyromatics, Inc. v. Petruziello*, 7 Ohio App.3d 131, 134, 454 N.E.2d 588, 592 (1983):

(1) The extent to which information is known outside of the business;

(2) The extent to which it is known by employees and others involved in the business;

(3) The extent of measures taken by the owner of the information to guard the secrecy of the information;

(4) The value of the information to the holder and his competitors;

(5) The amount of effort or money expended in developing the information;

(6) The ease or difficulty with which the information could be properly acquired or duplicated by others.

If the Court finds that Hudson breached the Agreements by using and/or divulging UGTC trade secrets or Information, it will then address plaintiff's request for permanent injunction barring Hudson from testifying against UGTC and using or disclosing UGTC Information while testifying against other tire manufacturers.

■ Before a court can issue a permanent injunction, the party seeking the injunction must make a clear showing that significant irreparable injury will result if the injunction it seeks is not granted and that there is no adequate legal remedy available. *City of Parma, Ohio v. Levi*, 536 F.2d 133, 135 (6th Cir.1976); *Detroit Newspaper Publishers v. Detroit Typographical Union No. 18*, 471 F.2d 872, 876 (6th Cir.1972). In making the determination of whether an injunction should issue, a court is also required to weigh the public interests which may be affected by issuance of such relief. *Inland Steel Co. v.*

*United States*, 306 U.S. 153, 59 S.Ct. 415, 83 L.Ed. 557 (1939).

■ A court may order a permanent injunction to enjoin a former employee from using confidential or trade secret information obtained from the former employer in order to protect a company's trade secrets or confidential information. *See Kuberski*, 421 Mich. at 190, 364 N.W.2d 609; *Valco*, 24 Ohio St.3d at 48–50, 492 N.E.2d at 820. If the Court issues a permanent injunction against Hudson, the injunction will remain binding upon Hudson until he can demonstrate that plaintiff's trade secrets or Information has become common knowledge, known to competitors, or otherwise lawfully available. *See Kuberski*, 421 Mich. at 190, 364 N.W.2d 609; *Valco*, 24 Ohio St.3d at 48–50, 492 N.E.2d at 820.

This is the legal context of the instant case, against which the Court shall apply its factual findings.

## IV. FACTUAL FINDINGS

### A. Credibility of Witnesses

The testimony of plaintiff's witnesses with respect to what constituted trade secrets, what measures were taken to ensure that Information remained confidential, and what Information was available to the public, contradicts defendant's testimony. Therefore, this Court must decide which side presented the more credible case.

■ This Court's resolution of the credibility issue was guided by the appearance and conduct of the witnesses, by the manner in which they testified, and by the character of the testimony given. During the trial, this Court considered each witness's intelligence, motive, bias or prejudice, state of mind, demeanor and manner while on the witness stand. This Court also considered each witness's ability and opportunity to have observed the facts and events to which he or she testified. Further, this Court considered whether the witness impressed this Court as

---

**1.** No reported cases have interpreted this statute section. The prior relevant Ohio statute relied upon the Restatement definition of trade secrets adopted by the *Kuberski* court. *See Valco Cincinnati, Inc. v. N & D Machining Service, Inc.*, 24 Ohio St.3d 41, 44, 492 N.E.2d 814, 817 (1986).

having an accurate recollection of the matters testified to, the relation each witness may bear to either side of the case, the manner in which each witness might be affected by this Court's judgment, and the reasonableness of the testimony in light of all the evidence admitted. Taking all of these matters into consideration, this Court has made certain judgments with respect to credibility or believability.

This Court finds that the plaintiff's witnesses were straightforward, non-evasive, and credible. The witnesses had clear recollection of many events, and identified when they were unsure of dates or times. The testimony of these witnesses was consistent with the others, particularly as to the confidential nature of Information and the extent to which Information was published or available to the public. The witnesses also corroborated any admissions or self-defeating testimony made by Hudson.

This Court finds that defendant was not credible. Hudson was very evasive, non-responsive, and often rambled in giving his answers. Many of his answers contradicted his deposition testimony. For example, at trial Hudson said he was told by Sandra Foster ("Foster"), a UGTC exit interviewer, that working for a competitor would not be a problem. In his deposition, however, Hudson stated that Foster had told him that working for a competitor might be a problem. Also, at trial, Hudson stated that he had begun working on the *Ford* litigation in July 1993, but in his deposition in November 1993, Hudson denied knowing anything about the *Ford* case until at least August 31, 1993.

The Court found it difficult to follow his testimony, as he repeated many of the same answers in response to completely different questions. Hudson made a number of representations that did not have any corroborating evidence or basis in fact. For instance, Hudson testified that *Smither's Reports,* a tire industry magazine, contained UGTC Information on adjustment data. In fact, as Jerry Leyden, an former Executive Vice–President of Smither's, testified, the *Smith-*

er's *Reports* did not contain any adjustment data at all, and certainly no confidential UGTC adjustment data.

Hudson's testimony also directly contradicted plaintiff's witnesses and exhibits on a number of issues. For example, Hudson claimed that adjustment data is not confidential. On the contrary, witnesses Andris Lacis ("Lacis"), Jerry Leyden ("Leyden"), Dwight Black ("Black"), and John Ashton ("Ashton") stated that adjustment data is confidential. The *Ford* court also stated that UGTC considers its adjustment data "very confidential." (Exhibit 14, p. 9). Defendant also claimed that virtually all the types of Information he reviewed in the *Ford* case were available in the *Smither's Reports,* and the information therein would enable a competitor to build the tire. However, the other witnesses, including Leyden, who worked for *Smither's,* testified that the *Smither's Reports* contained only general information about various types of UGTC Information, only information on a cured or vulcanized tire, and nothing that is being considered confidential at this trial. Additionally, nothing on the record suggests that a competitor could build a tire from the information contained in *Smither's Reports.*

This is by no means an exhaustive list, but merely provides examples of the testimony which lead this Court to believe that Hudson was not a credible witness.

 The Court held a bench trial on November 21–23, 28, and December 1–2, 1994. Based upon the testimony produced during the trial and the briefs and exhibits that the parties submitted, the Court makes the following findings for the purposes of plaintiff's action.[2]

**B. Hudson Breached the UGTC Agreements**

1. The 1987 and 1991 Agreements Prohibit Use or Disclosure of UGTC Information

The captions for the 1987 and 1991 Agreements signed by Hudson read: "Employee

---

**2.** Pursuant to *United States v. Cooke,* 915 F.2d 250, 252 (6th Cir.1990), when the testimony of witnesses differ in material detail, this Court will

indicate why it is crediting one witness' testimony over another witness' testimony.

Intervention and Confidential Information Agreement" and "Employee Secrecy and Non–Compete Agreement, respectively. (Plaintiff's Exhibits 1 and 3, respectively). The 1991 Agreement, at ¶ 14 provides, "This Agreement shall not replace or supersede, and shall be in addition to, any written Agreement between you and The Uniroyal Goodrich Tire Company ..." Therefore, because the 1991 Agreement does not supersede the 1987 Agreement, both Agreements are still valid and enforceable.

The 1987 Agreement does not contain a non-competition clause, but the agreement contains a paragraph on confidentiality:

> In consideration of my employment by The Uniroyal Goodrich Tire Company (the "Company"), I agree to the following obligations:
>
> 1. I will not use, publish or otherwise disclose, except as my Company duties may require, either *during or after* my employment, any unpublished information or data confidential to the Company or confidential to others without the Company's prior written consent. The term confidential is used in the ordinary sense. Without limitation, examples of materials, information and data which may be of a confidential nature are: drawings, manuals, notebooks, reports, models, formulas, customer lists, information pertaining to products, processes, machines or compositions, computer programs, accounting methods, business plans, information systems, financial information, and information relating to pricing and sales. (Emphasis added).

(Plaintiff's Exhibit 1, ¶ 1).

The 1991 Agreement has a confidentiality (non-disclosure) clause and a non-competition clause. The 1991 Agreement provides:

> As part of the terms and conditions of your employment by UGTC, and in consideration of the mutual promises contained in this Agreement, you agree as follows:
>
> 1. To maintain Information in confidence *at all times during and after your em-*ployment whether acquired before or after, or in the course of or arising from your employment with UGTC. You specifically agree that you *will not use* any Information, independent of your work for UGTC and *will not divulge* Information to others, *either during or after* employment by UGTC, except as specifically authorized and required by your duties to UGTC. (Emphasis added).
>
> \* \* \* \* \* \*
>
> 6. That you will not, for a period of two (2) years from the date of termination of your employment with UGTC, become associated with or employed by any individual, firm, or corporation, in any capacity involving research in, production of, or use of technology related to the production, design or testing of tires or related products, or any component or element thereof, or in any process or facilities for the production of any product, component or element thereof, (i) which is competitive, or is foreseeably competitive, with any product or component thereof which is the subject of previous, current, planned or anticipated UGTC research, design, development, manufacture, or sale activity prior to or at the time of your termination, (ii) with respect to which direct or related product or element thereof, or process or facilities for the production thereof, you possess or have had access to Information, or (iii) with respect to which the loyal and complete fulfillment of the duties of your new employment would inherently call upon you to reveal or to base your judgment upon or otherwise to use any UGTC Information.

(Plaintiff's Exhibit 3, ¶¶ 1, 6).

■ Without question, ¶ 6 of the 1991 Agreement has expired, as Hudson stopped working for UGTC on December 31, 1991, well over two years ago. Therefore, when read alone, ¶ 6 cannot operate to bar Hudson from working for Kurt Scientific or a competitor.[3] Accordingly, the Court finds that Hudson is not prevented from working for a

---

**3.** The Court makes this decision without deciding whether ¶ 6 ever operated to bar Hudson from working for Kurt Scientific.

UGTC competitor or Kurt Scientific on the basis of a non-compete clause.

However, based on straightforward reading of the Agreements, this Court finds that the confidentiality (secrecy or non-disclosure) clauses in the 1987 and 1991 Agreements are still valid. In both the 1987 and 1991 Agreements, ¶ 1 states that the employee signatory to the Agreement will keep confidential "any unpublished information or data confidential to the Company" (1987) and not use or divulge "any Information to others" (1991) either during or after his employment with UGTC, except as authorized by UGTC. The paragraphs simply state that the Information is to be kept confidential except as the Company allows or specifically authorizes. The paragraphs do not place a time limitation on how long an employee or former employee must keep the Information confidential.

Hudson argues that a) the two-year limitation in ¶ 6 modifies ¶ 1 of the 1991 Agreement, and b) the 1991 Agreement operates in such a manner as to give Hudson written consent to publish or disclose confidential information or data, as provided in ¶ 1 of the 1987 Agreement. The Court disagrees with both of these interpretations.

■ Each paragraph of the 1991 Agreement imposes a separate and distinct obligation on the signatory, and accordingly, must be read separately. The obligation in ¶ 6 to not work for a competitor for a period of two years from leaving UGTC does not, in any way, lessen or ease a signatory's obligation under any other paragraph. Thus, the two year term in ¶ 6 does not modify a signatory's duty under ¶ 1, to never reveal Information without UGTC consent, to mean that the signatory can reveal Information after two years. In fact, the obligation to keep Information confidential at all times during and after UGTC employment, provided for in ¶ 1 of each Agreement, prohibits an employee or former employee from using, divulging, or disclosing Information or confidential information or data at any time, even if the obligations under another paragraph are not as stringent or no longer apply. More specifically, even if Hudson now goes to work for a competitor, he is still prohibited from using, divulging, or disclosing UGTC

Information or confidential information or data.

■ The Court agrees with Hudson's argument that the 1987 Agreement allows a signatory to disclose confidential information or data with the Company's written consent. (Plaintiff's Exhibit 1, ¶ 1). However, the 1991 Agreement cannot be read as giving Hudson consent to use, reveal, divulge, or disclose confidential information or data. The 1991 Agreement does constitute a writing by the Company; however, a writing alone does not grant Hudson the authorization to disclose confidential information or data. The writing must exhibit the Company's **consent** to disclose confidential information or data. Rather than granting a signatory authorization to disclose confidential information or data, as Hudson argues, the 1991 Agreement actually demands more restrictive confidentiality obligations from an employee. Accordingly, the Court cannot agree that the 1991 Agreement constitutes written consent to disclose confidential data or information.

For the reasons stated above, this Court finds that the 1987 and 1991 Agreements operate to prohibit a UGTC employee, or former employee, from using, divulging, or disclosing Information or confidential information or data, unless specifically authorized to do so by UGTC. The Court also finds that UGTC did not specifically authorize Hudson to use, divulge, or disclose UGTC Information in this case. Finally, the Court finds that the non-compete clause of the 1991 Agreement has expired with respect to Hudson.

2. Plaintiff Established that Information was Confidential or Trade Secret

■ UGTC is a company engaged in the highly competitive, technology driven tire manufacturing market. According to current and former UGTC employees, much of the work performed at UGTC involves Information that the company desires to protect from competitors. Aggregate adjustment data, manufacturing specifications, plant specifications, road test data (including Laredo Proving Grounds and Los Angeles road test data)

and mold drawings are included among the documents, formulas, and knowledge UGTC alleges to be Information it desires to protect. The five types of Information listed above (the five types together shall hereinafter be referred to as "Data") constitute the type of matters that UGTC alleges Hudson used and/or disclosed while working for Kurt Scientific in lawsuits against UGTC. The Data are listed on time logs submitted to Kurt Scientific by Hudson. (*See* Exhibit 4M).

In order to establish that they are trade secrets or Information, plaintiff must satisfy the six factors set forth in *Kuberski* and *Pyromatics, supra.* This Court finds that plaintiff has established these six factors for each type of Data listed.

Witnesses Lacis and Black testified that UGTC's Data was not made available to anyone outside the company except in the discovery process of a lawsuit. These witnesses testified that they had never seen another company's Data, and that as far as they knew, UGTC's Data was not available to competitors or known to the public.

According to Lacis, Black, and Ashton, the company took numerous steps to ensure that the Data remained confidential. UGTC employees were requested, if not required, to sign secrecy and non-compete agreements when they worked in areas with access to trade secrets, confidential or proprietary information. UGTC restricted access to its plants, specifically the research and development plants, by requiring employees to display identification cards upon entering. Black testified that if an employee did not work in the facility, that employee had to sign in and out of the facility and was escorted to and from the office the employee was visiting. Confidential information was available to employees who had a "need to know" the information in order to perform their job, and the need to keep Data or Information confidential was stressed to employees in meetings.

Although few documents were stamped "confidential," Black testified that essentially all information or data in the research and development plants was confidential. Any information going outside a technical center was reviewed. Black also testified that technical facilities were locked and guarded twenty-four hours a day, and he stated that anyone carrying a briefcase or package out of a facility could be subject to a search by guards. Hudson's testimony that he trained tire dealerships on the adjustment process, but not in the same manner he trained inspectors at the UGTC plant, further demonstrates how the information available within the plant differed greatly from that leaving the plant.

The value of possessing the Data was set forth by plaintiff's witnesses, as follows. Lacis stated that the Data enabled UGTC to evaluate results of technological efforts, analyze production, and monitor concepts at UGTC; if given to a competitor, the Data would be of great value to that competitor. Lacis indicated that the value was significant because it showed the latest technology in a respective area of Data. He further indicated that if UGTC were to get a competitor's corresponding Data, UGTC could analyze that Data within each area of technical expertise to see how the competitor was developing a product. Leyden declared that although the value of the Data could not be assessed a dollar amount, the time and cost of development of the Data represented great value to a company, particularly with respect to adjustment data, where aggregate amounts constituted the basis of all adjustment and analysis work done on a tire.

In order to develop this Data, Lacis stated that computers, meetings, financial and human resources, and technical center facilities were used. Leyden supported that testimony, stating that the development of a tire takes years of work and is valuable to its owner.

Finally, Lacis, Leyden, and Black testified that the Data or Information could only be acquired and duplicated by others if UGTC were to sell the Data at a high price, subject to a licensing agreement; or a competitor sought to buy a cured tire, take it into the field, test it, break it down, etc. These three witnesses also testified that the latter method would be impractical, if not impossible, because the technological input and under-

standing UGTC used to develop the product would not be found in the finished product.

Hudson argues that the Information was not treated as confidential by UGTC or within the tire industry. Hudson contends that all this information is available in the *Smither's Reports*. Hudson declared that a competitor could use the information contained in *Smither's Reports* to understand the Information UGTC claims is confidential. This Court finds Hudson's testimony on this subject disingenuous.

Leyden, who worked for *Smither's* and the Firestone Tire Company, described the type of information available in *Smither's Reports*. Leyden testified that *Smither's* based its analysis on finished or cured tires and that the analysis would only provide an analytical breakdown of the physical nature of certain tires. Leyden stated that tire manufacturing specifications could not be reproduced with the information in the *Smither's Reports* and added that *Smither's Reports* never contained adjustment data. Lacis' testimony corroborated Leyden's. Lacis testified that *Smither's* does not provide adjustment data or tell a reader what the manufacturing specifications for a particular tire are.

Neither party supplied the Court with a copy of *Smither's*. As such, based on the testimony discussed above and given at trial, this Court finds that *Smither's Reports* did not contain UGTC Information.

Hudson stated that UGTC Information is readily ascertainable from other sources. Hudson submitted numerous newspaper, trade magazine, and journal articles that he believed showed that UGTC Information was available to the public. The Court, having reviewed the articles, finds that the articles refer only to general tire information, not UGTC Information or trade secrets as discussed in this case. (*See* Defendant's Exhibits 27–29, 31, 33, 34, 38, 40)

Hudson also stated that Information is available to the public through government studies and company tours and a company video. This testimony was unsupported by Hudson, and the testimony of other witnesses was to the contrary. Lacis testified that the company video visually exposed the public to the tire making process, but the video was reviewed by management to minimize the opportunity for competitors to see UGTC's exact tire making process. According to Lacis, the video did not provide specifications, measurements, composition percentages of raw materials, mold drawings, or other important data or documents. Company tours given to other tire manufacturers were made subject to licensing agreements under which the manufacturers were also bound to keep Information secret. The Court finds, as it did with the *Smither's Reports*, that UGTC did not disseminate information or data it considers confidential on company videos or tours. Finally, Black testified that while studies, tests, or information were supplied to the government at the government's request, the same was never provided to the public.

Hudson also stated that the information UGTC claims is confidential has no competitive value. That testimony was self-serving and contrary to the testimony of the other witnesses. As discussed above, Lacis, Leyden, and Black testified that the Data at issue in this case is valuable to UGTC and would be highly beneficial and valuable to a competitor. Additionally, Leyden testified that UGTC and other tire manufacturers sell much of their Information to secondary tire manufacturers and third world manufacturers, even after the Information is outdated in the United States. According to Leyden, Information maintains significant value with respect to these companies up to ten years after being introduced in the United States.

Accordingly, the Court finds that the Information or Data at issue is confidential or trade secret.

3. Defendant Hudson had Access to Information and Used the Information while at UGTC

By his own admission, Hudson has never worked for any tire company other than UGTC. He gained all of his experience in the tire industry at UGTC. Hudson always worked in technological centers for UGTC. He worked in UGTC's Research and Development Plants in Detroit and Troy, Michigan, and Akron, Ohio. At various times dur-

ing his employment, Hudson analyzed, researched, developed, and tested tires. He was provided training in specifications, had access to and saw complete tire specifications, talked with engineers about specifications, and answered engineers' questions about specifications. In doing so, Hudson came to know about and to understand UGTC specifications.

Hudson also testified that he was familiar with adjustment forms, how adjustment data was searched and collected in the field and sent into the company. He saw various adjustment analyses and/or tabulations at meetings with Black and on his own. Additionally, Hudson trained persons how to look at tires for the purpose of adjustments and provided updated training for employees.

Lacis and Black, both of whom worked with Hudson at UGTC, testified that Hudson had access to any of the Information that Hudson needed in his employment duties. Lacis stated that Hudson was involved in developing adjustment data information. Lacis further stated that Hudson had access or clearance to, and reason to look at, manufacturing and plant specifications and road test data. Hudson also had access to, if not reason to look at, mold drawings. Black declared that Hudson was responsible for training employees at an adjustment location on tire failure and how to classify the failures. Black also stated that Hudson was present at, did analysis and prepared reports for, and took minutes for, a product performance committee that reviewed new products or materials investigated by chemists.

Other factors in this case also support a finding that Hudson had knowledge of the Information or Data at issue. The most significant factor was that Hudson would never have been hired to testify, even generally, on the topics that he reviewed (manufacturing and plant specifications, adjustment data, mold drawings, road test data) in *Papazian* or *Ford,* or testify in the *Ford* litigation, if he did not have adequate knowledge in these subject areas. The trial brief submitted by Hudson supports this finding, as exemplified by the following statement:

> If counsel cannot consult with Mr. Hudson to determine what he knows and whether he has relevant factual information regarding their case, obviously they cannot call him as a witness.

(Defendant's Trial Brief, p. 16).

If Hudson did not have relevant factual information regarding the manufacturing and plant specifications, adjustment data, mold drawings and road test data, obviously the *Papazian* and *Ford* attorneys would not have called him as a witness in that case.

For the reasons stated, particularly Hudson's own admissions, this Court finds that Hudson had access to, and knowledge of, the Information.

4. At a Minimum, Hudson Used, if not Disclosed, Information in the *Ford* Case

As evidenced by Hudson's knowledge of UGTC Information, time logs from Kurt Scientific (Plaintiff's Exhibits 4D and 4M), Hudson's compiled notes made in preparation for his *Ford* depositions, and the fact that *Ford* plaintiffs used Hudson as a witness, this Court finds that Hudson used UGTC Information in preparing to testify and during his depositions in the *Ford* litigation.

Several circumstances and items of evidence suggest that Hudson disclosed or divulged some UGTC Information, namely adjustment data for the particular brand of tire at issue in the *Ford* case. Some of that evidence includes: 1) the conversations Hudson admitted having with Roberta Holladay, Hudson's supervisor at Kurt Scientific; 2) discussions Hudson admitted having with *Ford* attorneys; 3) Hudson's time logs compiled during the *Ford* litigation; 4) the fact that Hudson and his attorney were in Atlanta at the *Ford* plaintiffs attorneys' office; and 5) the fact that Hudson communicated with the Ford attorneys through his own attorney. One of Hudson's time logs from the *Ford* litigation reads: "reviewed adjustment data" and "met with Smolar [one of *Ford* plaintiffs' attorneys] most of the day to review anything that might not have been covered." (Plaintiff's Exhibit 4D). Significantly, an affidavit signed by *Ford* attorney James Seifter and the *Ford* plaintiffs' witness list, also submitted by James Seifter, both contain

assertions that Hudson would testify on UGTC Company adjustment criteria and policy, adjustment rates, condition codes, base his testimony on his experience at UGTC. (*See* Plaintiff's Exhibit 7; Plaintiff's Exhibit 10, p. 9–10). Although neither of these documents were admitted to prove the truth of the matter asserted, and are therefore not relied upon for that purpose by this Court, the documents do demonstrate that a *Ford* plaintiffs' attorney was willing to swear that he knew the substance of Hudson forthcoming testimony. The fact that the Seifter affidavit and the *Ford* expert witness list were submitted to a court of law, taken in conjunction with the fact that the *Ford* attorneys extensively discussed adjustment data with Hudson and wanted Hudson to testify in their case, convinces the Court that UGTC Information was divulged or disclosed by Hudson.

■ On the basis of the Court's factual findings thus far, the Court finds that Hudson has breached the 1987 and 1991 Agreements.

5. Hudson will use, if not disclose, Information in future cases against UGTC if called as an expert witness in those cases

As evidenced by the fact that Hudson used UGTC Information in the *Papazian* and *Ford* cases and disclosed Information in (at least) the *Ford* case, and the fact that a party would not call Hudson as a witness unless the party knows Hudson has relevant factual information, this Court finds that if Hudson testifies against UGTC, he will be using, if not disclosing, UGTC Information, in further violation of the Agreements. In violating this Court's preliminary injunction, Hudson demonstrated that he will use UGTC Information if he testifies against UGTC.

Because the Court has found that Hudson has and will continue to violate the confidentiality clauses of the UGTC Agreements, the Court now examines and balances the benefit, need, usefulness, and harm that would stem from the issuance of a permanent injunction in this case.

## C. A Permanent Injunction Shall Issue

1. A threat of irreparable harm exists in the event Hudson uses or discloses Information

The witnesses stated that in the highly competitive, technology driven tire industry, the disclosure of one company's trade secrets or confidential or proprietary information could cause significant, immeasurable harm. Plaintiff fears that Information would be communicated to competitors if Hudson uses and discloses UGTC Information to plaintiff's attorneys or other experts before a protective order could be issued.

■ Although none of the witnesses stated they had personal knowledge that plaintiff's attorneys or other experts had ever communicated Information to competitors, the Court finds that such a communication could occur. When an expert participates in an official court proceeding, protective orders can be issued which try to ensure confidentiality. Consultations by an expert prior to official, on the record, proceedings lack the same protections. Even if plaintiff's attorneys or other experts do not communicate UGTC Information to competitors directly, the Information is placed into the public realm. As this Court has previously noted, and several witnesses testified, once the Information is out, it is out; then the Information is accessible to anyone.

Additionally, as discussed above, the Court notes that the major United States tire manufacturers are not the only companies to which UGTC Information would be valuable. Therefore, even if major competitors are not the recipients of Information made accessible to competitors or the public (by persons such as Hudson breaching Agreements), potential UGTC clients could obtain the Information before UGTC had an opportunity to sell the same.

The threat of this Information reaching UGTC competitors is substantial and, if realized, would cause irreparable harm to UGTC in the highly competitive tire manufacturing industry. UGTC has claimed that it has no adequate remedy at law for this breach of contract because it cannot place a monetary figure on its losses should Information be

obtained by a competitor or secondary tire manufacturer. Hudson has not argued that an adequate remedy at law exists should UGTC Information be disclosed to other tire manufacturers. Accordingly, the Court finds that UGTC would be irreparably harmed if Hudson were allowed to continue using and disclosing UGTC Information.

2. Harm to Hudson is not severe, particularly in light of the contract he signed

If plaintiff's request for relief is granted, Hudson will be prohibited from consulting and testifying against UGTC in any case, as well as in any case where Hudson would have to use or divulge UGTC Information. Hudson argues, and the Court agrees, that this will limit his ability to acquire work as a tire expert. However, the Court also finds that Hudson can still testify as a tire expert in many other cases, against many other tire manufacturers.

Additionally, the valid Agreements Hudson voluntarily signed, for which he was given consideration, prohibit him from using or divulging UGTC Information. To testify against UGTC, Hudson would necessarily have to use Information in his analysis. For that reason, Hudson cannot testify against UGTC and cannot use or disclose UGTC Information.

3. The issuance of a Permanent Injunction is in the public interest and does not contravene public policy considerations

The public interest is best served in this case if the Court enters a Permanent Injunction against Hudson. The public has an interest in having valid contracts enforced. Hudson has already shown a propensity to breach the contract he signed, even in light of this Court's Preliminary Injunction prohibiting such conduct. In the absence of a Permanent Injunction and the threat of future contempt proceedings, the Court believes that Hudson will continue to breach the Agreements he signed with UGTC.

Hudson's counsel contends that the issuance of a Permanent Injunction would contravene public policy because tire manufacturers could ignore public safety concerns. Hudson argues that his testimony is necessary to protect the public from tire defects

that exist in the industry, namely by UGTC, and that if he is prevented from testifying as to UGTC defects or tests or Information, the public's safety is at risk. If Hudson was the only tire expert available to testify as a plaintiff's expert, or if Hudson was the only tire expert who could adequately testify against UGTC, Hudson's argument might have merit. However, other plaintiff's tire experts are available to testify against UGTC, reveal UGTC tire defects, and explain UGTC tests. The Court notes that UGTC has lost several cases in which Hudson was not a witness.

Hudson's argument might also have merit if some evidence existed that showed that UGTC did not disclose Information in the discovery process or that UGTC withheld data or information from plaintiff's attorneys where protective orders were in place. However, as the record is void of any evidence or argument to support either theory, the Court does not believe that granting plaintiff's requested Permanent Injunction would be against public policy. Therefore, the Court concludes that the issuance of a permanent injunction is in the interest of public policy.

4. The Parameters of the Permanent Injunction

 The effect of the Permanent Injunction is two-fold. First, Hudson is prohibited from testifying as an expert witness against UGTC. Second, although Hudson may continue testifying as an expert witness in cases not against UGTC, **prior to** any use or disclosure of **any** UGTC Information, Hudson must **immediately** notify UGTC in the course of, or prior to the commencement of, consultation and/or testimony, whichever comes first, where it appears that Hudson may be called upon to use, disclose, discuss or testify about any UGTC Information.

As set forth in the application of law section, *supra* at p. 7, the Permanent Injunction shall remain intact until Hudson can demonstrate that the UGTC Information at issue is in the public domain.

Finally, with respect to a hearing on attorneys fees and costs stemming from ¶ 16 of the 1991 Agreement, the Court finds that such a hearing would be inappropriate in the event this case is appealed. Therefore, no hearing will be scheduled until after the running of the applicable appeal period. In the

event of an appeal, a hearing on attorney's fees and costs will be postponed until the Sixth Circuit issues an opinion.

## V. CONCLUSION

For the reasons stated herein, the Court HEREBY ORDERS that plaintiff Uniroyal Goodrich Tire Company's request for relief be GRANTED. IT IS FURTHER ORDERED that Defendant William L. Hudson, a/k/a Willie L. Hudson, is HEREBY PERMANENTLY ENJOINED from testifying as an expert witness against UGTC. IT IS FURTHER ORDERED that **before** Hudson uses or divulges any UGTC Information in any matter, Hudson shall immediately notify UGTC in the course of, or prior to the commencement of, consultation and/or testimony, whichever comes first, in such matter where it appears that Hudson may be called upon to use, disclose, discuss or testify about any UGTC Information. IT IS FURTHER ORDERED that in the event this case is appealed to the Sixth Circuit, the hearing on attorney's fees and costs shall be postponed until the Sixth Circuit issues an opinion.

IT IS SO ORDERED.