OPINION
{¶ 1} Plaintiff-Appellant, Gregory Wannemacher, appeals a decision of the Hardin County Court of Common Pleas, rendering judgment in favor of Defendant-Appellee, Donna Cavalier ("Donna"). On appeal, Wannemacher contends that the trial court abused its discretion by not accepting the jury's verdict on the issue of rescission and that the trial court's substitution of its judgment for that of the jury denied Wannemacher of his constitutional right to a trial by jury on all issues triable to a jury. Additionally, Wannemacher contends that the trial court's judgment is against the manifest weight of the evidence. Finding that the trial court's judgment was not against the manifest weight of the evidence, that the trial court had an absolute right to render judgment on the issue of rescission and that all other issues were incidental to the equitable issue of rescission, we affirm the judgment of the trial court.
 {¶ 2} In January of 1999, Wannemacher, the majority stockowner and operator of Wannemacher Truck Lines ("WTL"), contacted Carter Cavalier ("Carter"), Donna Cavalier's husband (hereinafter jointly referred to as the "Cavaliers"), to offer Carter's company, Warehouse Express Company, Inc. ("WEC"), additional warehouse space. During Wannemacher and Carter's conversations, they began discussing the possibility of merging WTL and WEC.
 {¶ 3} Both WTL and WEC were closely held corporations, which dealt in the trucking and warehousing businesses. WTL was an over-the-road trucking and warehouse company located in Lima, Ohio. WTL's stock was held by Wannemacher, his wife and his two children. WEC was an on-the-road trucking and warehouse company located in Kenton, Ohio. Fifty-one shares of WEC's stock were held by Carter, while Donna owned the remaining forty-nine shares.
 {¶ 4} During Wannemacher and Carter's merger conversations, the two discussed the possibility of merging the administrative functions of the two companies. Carter, who had run WEC since he started the company in the early nineteen-nineties, was dealing with health issues and contemplating retirement. He had hoped to phase himself out of the day-to-day operations of the company and was looking to Wannemacher to take over those duties. Wannemacher had recently lost his largest client, Proctor Gamble, and was looking at other ways to expand WTL. Wannemacher was also attracted to WEC's minority business status, which allowed it certain contract preferences. Thus, the two began working towards merging WEC and WTL.
 {¶ 5} In February of 1999, Wannemacher and Carter executed a confidentiality agreement, allowing Wannemacher to inspect WEC's records, so that he could determine whether he would ultimately enter into the merger agreement. During this period, Wannemacher inspected WEC's March 31, 1999 balance sheet, WEC's 1997 corporate taxes, WEC's six-year business performance sheet, WEC's lease obligations and some of WEC's operations and customer lists. Wannemacher and other WTL employees met with WEC employees and inspected WEC's truck and trailer equipment, performing many required inspections for some of WEC's trucks. Wannemacher also inspected WEC's warehouse and property with Carter. Additionally, Wannemacher talked to several of WEC's customers, and he and Carter met WEC's largest customer, Occidental.
 {¶ 6} Following the above inspections, Wannemacher and Carter determined that WEC's stock was valued at eight thousand dollars per share. To determine the stock value, Wannemacher and Carter relied upon the March 31, 1999 balance sheet, mutually agreeing to delete certain items.
 {¶ 7} In April of 1999, Wannemacher and Donna entered into a stock purchase agreement, whereby Wannemacher agreed to purchase Donna's forty-nine shares of stock for three hundred and ninety-two thousand dollars to be paid in two installments. The first installment of two hundred thousand dollars was to be paid on the date of closing, and the second installment was to be paid on April 30, 2001. The initial payment was made at closing by Wannemacher transferring eight thousand sixty-three shares of common stock from the Commercial Bank of Delphos.
 {¶ 8} Following the closing and as per the negotiations, Wannemacher and WTL began to take over the day-to-day administrative operations of WEC. In May of 1999, WTL began handling WEC's accounts receivable. At that time, WEC employees handed over all accounts receivable information to WTL and WTL was to integrate WEC's accounts receivables into its system. In June of 1999, WTL took over WEC's accounts payable. During this period WTL was also taking other debt reduction and financing steps for WEC.
 {¶ 9} In July of 1999, after several problems arose, Wannemacher took steps to rescind the stock purchase agreement and to have each party return the other's property. Carter, on behalf of Donna and after speaking to counsel, refused rescission, but did resume all of WEC management responsibilities. On the same day that Carter refused rescission, Carter sold WEC's real estate for approximately 1.5 million dollars.
 {¶ 10} In September of 1999, Wannemacher filed a complaint against Donna alleging fraud and breach of contract. In Wannemacher's complaint, he set forth three claims. In the first and second claim, Wannemacher prayed for damages in the sum of two hundred thousand dollars based on wrongful concealment and misrepresentation. In the third claim, Wannemacher prayed for rescission, stating:
Plaintiff stands ready, willing and able to return theforty-nine (49) shares of common stock in Warehouse Express Co.Inc., to Defendant Donna M. Cavalier, or her assigns, in exchangefor the return of Two Hundred Thousand and 00/100 Dollars($200,000.00) or eighty-one hundred sixty-three (8,163) shares ofcommon stock of The Commercial Bank of Delphos.
 {¶ 11} All three of Wannemacher's claims were based upon the Cavaliers' breach of the "Full Disclosure" clause of the stock purchase agreement. The "Full Disclosure" clause provided the following:
No representation or warranty made herein, and no schedule,list, certificate, or instrument or exhibit furnished or to befurnished by Seller pursuant to this Agreement or in connectionwith the transaction contemplated hereby contains or will containany untrue statement of a material fact or omits or will omit anymaterial fact necessary to make the statements contained hereinor therein not misleading. Neither the Buyer nor any person orfirm which is the agent, attorney, accountant or employee of theBuyer has made any expressed or implied representations orwarranties to any Seller except as set forth in this Agreement orin any document or financial statement referred to in thisAgreement.
 {¶ 12} According to the complaint, the Cavaliers' representations, made pursuant to the "Full Disclosure" clause, "were false when made" and "material facts were not disclosed[;]" the Cavaliers "knew and intended at the time of preparation and issuance of the statements of the financial condition of [WEC], as prepared and warranted by them, that this information would come to the attention of and be read by and relied upon by [Wannemacher] in the purchase of the stock as provided for in theAgreement[;]" the Cavaliers' false representations and omissions were made with the purpose of concealing WEC's true stock value; Wannemacher relied upon the Cavaliers' false representations and omissions in making his determination to enter into the stock purchase agreement; and, if Wannemacher had known about the false representations and omissions, he would not have entered into the stock purchase agreement.
 {¶ 13} Additionally, Wannemacher filed a jury demand
 {¶ 14} Subsequently, the Cavaliers filed an answer, denying Wannemacher's claims and alleging the affirmative defenses of waiver, estoppel, latches and unclean hands. Additionally, the Cavaliers filed a counterclaim, alleging breach of contract, fraud and conversion of corporate assets. Wannemacher filed a reply denying each of the counterclaims.
 {¶ 15} In May of 2003, the matter was tried to a jury. At trial, Wannemacher presented the testimony of himself, Carter, Donna, Julie Dearing, the Cavaliers' daughter and general manager of WEC, and Beth Nickels, WTL's human resource director and comptroller in the spring of 1999. The Cavaliers also presented the testimony of themselves and Wannemacher, along with Mandy Franz, a former employee of WEC and Cavalier Farm Services, which was another company owned and operated by the Cavaliers.
 {¶ 16} At trial both Wannemacher and Carter testified to the above account of how the issue of merger had come about. Additionally, there was also testimony by both that they used the March 31, 1999 balance sheet to determine the value of WEC's stock. The balance sheet listed current, long term and other assets, as well as current and long term liabilities, and, finally, stockholder equity. Specifically, the balance sheet listed the following figures:
ACCT NO: DESCRIPTION: CURRENT YEAR:
CURRENT ASSETS
 1020 OPERATING ACCOUNT (129333.69) 1030 WORKER'S COMP DEPOSITS 1058.12 1100 ACCOUNTS RECEIVABLE 421674.44 1102 NOTES RECEIVABLE 254781.88 1350 DRIVERS ADVANCES 5885.12 1400 INVENTORY 27020.28 __________ TOTAL CURRENT ASSETS 581086.15
LONG TERM ASSETS
 1600 OFFICE EQUIPMENT FURNITURE 162534.11 1610 PRODUCTION EQUIPMENT 438334.28 1620 TRUCKS EQUIPMENT 1453978.25 1630 BUILDINGS 1576286.48 1640 LAND 124341.00 1700 ACCUMULATED DEPRECIATION (1133585.40) 1800 STOCK 47152.31 __________ TOTAL LONG TERM ASSETS 2669041.03 1910 OTHER ASSETS 17086.77 __________ TOTAL ASSETS 3267213.95 ========== CURRENT LIABILITIES
 2000 ACCOUNTS PAYABLE 21938.51 2020 DEFERRED TAXES 156400.00 2100 SHORT TERM DEBT 165546.06 ACCRUED TAXES PAYABLE 2273.94 _________ TOTAL CURRENT LIABILITIES 346158.51
 2500 LONG TERM DEBT 1503594.82 __________ TOTAL LIABILITIES 1849753.33
STOCKHOLDERS EQUITY
 3000 CAPITAL STOCK 500.00 3900 RETAINED EARNINGS 1466924.11 NET PROFIT (499693.49) ___________ TOTAL STOCKHOLDER EQUITY 1417460.62 __________ TOTAL LIABILITIES EQUITY 3267213.95 ==========
From the above balance sheet, Wannemacher and Carter agreed to delete the following items:
 Accounts Receivable $ 40,963.54 from Harmond Technical Coating * * * Note Receivable $254,781.88 from Slantpac Corp. * * * Stock $ 47,152.31 Stock in Cavalier Farm Services * * * Trucks and Equipment $ 14,374.00 1994 Dodge 2500 PU * * * Trucks and Equipment $ 27,548.46 1998 Oldsmobile * * * Trucks and Equipment $ 10,000.00 Ten 1979 Dorsey Trailers, 45' Storage Trailers Sold in April of 1999.
 {¶ 17} According to Wannemacher, the stock price was agreed upon by him and Carter based upon the March 31, 1999 balance sheet. During his testimony he stated that him and Carter deducted the agreed upon deletions from the balance sheet, as well as looked at the companies cash flow performance and the value of WEC's real estate and came up with the eight thousand dollars per share. According to Wannemacher, the above deletions were the only items being deleted from the balance sheet in negotiating the price of the WEC stock. Carter, however, testified to several additional deletions from the balance sheet, including an additional deduction of one hundred thirty-seven thousand twenty dollars in assets and of one hundred fifty-six thousand four hundred dollars in deferred taxes from the current liabilities section. While there were some discrepancies as to how Wannemacher and Carter came to the eight thousand dollar per share figure, they both agreed that they did ultimately agree to that sales price.
 {¶ 18} Wannemacher went on to testify that after he began running WEC several things came to light, which he had not been aware of prior to taking over the day-to-day operations of WEC. First, Wannemacher testified that until he took over the WEC operations he was unaware that Slantpac Inc. ("Slantpac"), another closely held corporation owned by the Cavaliers, was not a wholly owned subsidiary of WEC. According to Wannemacher, during his investigation period of WEC he had come to the conclusion that Slantpac was a wholly owned subsidiary of WEC. Wannemacher based this information on WEC's 1997 corporate tax forms, where Slantpac was listed as a subsidiary of WEC. Wannemacher stated that he tried to discuss this issue with Carter, but that Carter had quickly changed the subject.
 {¶ 19} Based on Wannemacher's belief that Slantpac was a subsidiary of WEC, he also believed that he owned forty-nine percent of Slantpac. Upon finding out that Slantpac was not a subsidiary of WEC, Wannemacher became concerned, realizing that it was Slantpac and not WEC that owned a majority of the warehouse that Wannemacher believed was owned by WEC.
 {¶ 20} Second, Wannemacher testified that once he took over operations of WEC he became aware that Occidental, one of WEC largest clients, was unhappy with WEC and was taking steps to discontinue its business relationship with WEC. According to Wannemacher, he was told by Julie Dearing that Occidental and WEC had had some problems in the past, but that all issues were being resolved. Wannemacher also testified that Carter had assured him that WEC and Occidental's business relationship was fine.
 {¶ 21} Third, Wannemacher testified that after he took over the operations of WEC, he discovered that a three acre parcel of land that he believed to be owned by WEC was actually personally owned by the Cavaliers. Wannemacher stated that, during his investigation of WEC, him and Carter had discussed the land and the buildings and he believed that the three acres were part of WEC's assets. Wannemacher admitted that he had not conducted a title search of this property prior to the closing of the stock purchase agreement.
 {¶ 22} Finally, Wannemacher testified that, upon WTL taking over WEC's accounts receivables, as WEC "* * * started to go through some of the accounts receivables, it didn't seem to match with what was given to us." (Tr. Transcript 368.) He testified that he became concerned because WEC's ledger did not match some of the previous information he had been given. At that point, Wannemacher also discovered that several of the Cavaliers' personal expenses were being paid for by WEC. Additionally, Wannemacher testified that WTL started receiving calls from WEC's vendors, claiming they had not been paid. When WTL's staff started looking into the problem, they discovered that checks were shown to have been written to the vendors. However, when Wannemacher approached Carter about the issue, Carter told him that the checks had been written, but that they had not been sent out and were in Carter's desk drawer. Wannemacher testified Carter then turned the checks over to him. Wannemacher also testified that, prior to approaching Carter about the missing payments, he had not been previously informed of Carter's check holding procedure and that the checks totaled approximately two hundred fifty thousand dollars.
 {¶ 23} Wannemacher went on to testify that based upon the above discoveries he approached Carter about rescinding the stock purchase agreement. It was at this time that Wannemacher claimed he gave WEC's information back to Carter.
 {¶ 24} Beth Nickels, WTL's human resources director and comptroller, also testified on behalf of Wannemacher. Nickels testified to the day-to-day operational procedures used to merge WEC and WTL. She testified to the problems WTL experienced with WEC's vendors and the general confusion the WEC/WTL merger created. She also testified that when WTL handed WEC's administrative duties back to Carter all leases, mortgages and utilities were up to date and that WTL forwarded all checks received after the merger fell apart.
 {¶ 25} Wannemacher also presented the testimony of Julie Dearing, the Cavaliers' daughter and the present general manager of WEC. Dearing testified that during the spring of 1999 she was WEC's shipping and receiving clerk and that she handled all of WEC's shipping and receiving paperwork. She testified that prior to working as the shipping and receiving clerk, she had been handling the accounts receivable and payable with Mandy Franz. She testified as to her father's check holding procedure, stating that she and Franz would write the checks to pay the vendors as the bills came in. She and Franz would then give Carter all the checks. Carter would then hold the checks in his desk, sending them out as money was deposited into WEC's checking account to cover the checks. She stated this is how Carter had always conducted business.
 {¶ 26} Dearing also testified that the "Accounts Payable" figure on the balance sheet "represented the bills to be paid." (Tr. Transcript 249.) And, that the checks in Carter's drawer were represented by the "Operating Account" figure, which was a negative figure on the March 31, 1999 balance sheet. (Id.) She stated that the "Operating Account" figures came from WEC's information in the computers, which included checks that had already been written and did not necessarily reflect the dollar amount in WEC's checking account.
 {¶ 27} Dearing also testified to WEC's relationship with Occidental. According to Dearing, prior to the WEC/WTL merger, Occidental had been WEC's biggest customer. Additionally, she testified that prior to the WEC/WTL merger there had been an accident in WEC's warehouse, where Occidental's property had been damaged. However, she stated that such problems had been remedied and that at the time of the merger she was not aware of any talk of Occidental discontinuing its business with WEC.
 {¶ 28} Finally, Donna testified that while it was her stock that was sold, she had been acting upon Carter's request and had nothing to do with the negotiations of the sale or with the operations of WEC.
 {¶ 29} During the presentation of the Cavaliers' case, testimony and evidence was presented to show that Carter had not hidden any information from Wannemacher and that it was Wannemacher who had failed to make the proper inquiries, breaching his own duty of due diligence.
 {¶ 30} First, Carter testified at length to the adjustments he claimed were made to the March 31, 1999 balance sheet figure, which was used to value the stock. Specifically, Carter referenced a copy of the March 31, 1999 balance sheet to which he had made handwritten notations during his negotiations with Wannemacher. He noted the deletions that Wannemacher had testified to, as well as additional deductions made to the assets and current liabilities. He stated that at the time of their negotiations, WEC's stockholder equity totaled approximately 1.2 million dollars and that the adjustments brought the price down to approximately eight hundred thousand dollars, from which they derived the purchase price of eight thousand dollars per share.
 {¶ 31} Next, Carter put forth an explanation for each of Wannemacher's above concerns. Carter testified that Slantpac was not a wholly owned subsidiary of WEC. According to Carter, Slantpac was and had always been its own corporation. Carter did acknowledge that WEC's 1997 corporate tax form and a letter from 1996, both listed Slantpac as a subsidiary of WEC. However, referring to the 1997 corporate tax form, Carter stated that his accountant prepared his taxes, that Slantpac was only listed as a subsidiary for tax purposes and that he did not know the reason that Slantpac was listed as a subsidiary of WEC for tax purposes. Additionally, Carter testified that Slantpac only owned a small amount of equipment, including three welders, and that Slantpac's equipment was not listed on WEC's balance sheet. Finally, Carter testified that he and Wannemacher never discussed Slantpac and WEC's relationship, nor did Wannemacher question that relationship.
 {¶ 32} Second, Carter testified that he was aware that Occidental was pulling its business from WEC and that Occidental's business began to slow down in June of 1999. According to Carter, Occidental only decided to take its business somewhere else after Wannemacher and WTL had taken over. He stated that he had no communication with Occidental and that there were no meetings prior to the closing of the stock purchase agreement where Occidental had voiced its dissatisfaction with WEC.
 {¶ 33} Third, Carter testified that the three acre parcel of land was clearly titled in the Cavaliers' names and that a simple title search would have revealed that fact.
 {¶ 34} Carter also addressed those items that Wannemacher had complained were included on the balance sheet at the time of their negotiations, but which were not part of WEC once he took over, which included the freightliner and the Motor Coach. According to Carter, those items were either accounted for in the agreed upon deletions from the balance sheet or were items that never had been included on the balance sheet. Carter noted that the freightliner and Motor Coach were titled personally to the Cavaliers and were most likely taken off the balance sheet prior to the negotiations because they were no longer being used for WEC business purposes.
 {¶ 35} Carter also addressed the check holding issue. According to Carter, he was not sure if he showed Wannemacher WEC's accounting method of writing checks and holding them until there were sufficient funds. Carter testified that he had run WEC since it started in 1991 and that he had always held checks until there were sufficient funds in WEC's account. This was the method that he had always used at WEC. According to Carter, there was not much of a discussion on how the day-to-day operations were run. The day after the closing, all WEC records were handed over to Wannemacher and WTL and Wannemacher and his staff were running WEC within a few days. Carter went on to testify that he did turn the checks over to Wannemacher when he was approached about them and that Wannemacher never sent the checks out.
 {¶ 36} Finally, Carter testified that Wannemacher was given sufficient time to inspect WEC's record and that he would have agreed to rescission had WEC been put back in the position it had been in prior to the stock purchase agreement. According to Carter, after he and Wannemacher had signed the confidentiality agreement, Wannemacher had the right to look at any and all of WEC's financial information. Additionally, Carter had given Wannemacher permission to contact and speak with his accounting firm in order to further obtain information to make his decision. Carter testified that Wannemacher was given access to WEC's records from 1995, until the time of their negotiations and that Wannemacher was given a sufficient time and opportunity to inspect all of these records. Carter stated that at the time Wannemacher proposed rescission, Carter would have considered it but for the fact that WEC was in such bad shape financially.
 {¶ 37} The Cavaliers also presented additional evidence to support their counter-claims of breach of contract, fraud and conversion of corporate assets, including evidence of the quick sale of WEC's real estate, the loss of Occidental's business and the general diminution of WEC was the result of Wannemacher's careless management of WEC. However, because these issues are not being raised on appeal, we will not address that evidence.
 {¶ 38} At the close of Wannemacher's case and at the close of all the evidence, the Cavaliers moved the court for judgments of dismissal on Wannemacher's fraud and punitive damage's claims. Both motions were denied. The jury was then charged and ultimately retuned a verdict in favor of Wannemacher on the claim of rescission. Separate verdicts were returned in favor of Wannemacher on all of the Cavaliers' counterclaims. Additionally, the jury found Wannemacher was entitled to punitive damages and attorney fees.
 {¶ 39} Following the discharge of the jury, Wannemacher moved for a judgment on rescission and the Cavaliers moved for judgment notwithstanding the verdict ("JNOV"). Both motions were taken under advisement. On June 6, 2003, the court filed a written opinion wherein it determined that on the issue of rescission the jury verdict was advisory only. Additionally, the court found that the burden of proof as to the issue of rescission of the contract based on fraud, punitive damages and attorney fees was upon Wannemacher, as the plaintiff, and that Wannemacher had failed to prove his case by clear and convincing evidence. Accordingly, the court found that Wannemacher had not demonstrated the right to rescission and rendered judgment in favor of the Cavaliers.
 {¶ 40} On June 13, 2003, the Cavaliers renewed their JNOV motion through a written motion.
 {¶ 41} On July 31, 2003, the court filed its judgment entry rendering judgment in favor of the Cavaliers upon the issue of rescission and awarded Donna performance upon that contract, including the payment of one hundred and ninety-two thousand dollars, the balance of the contract. The court awarded judgment in favor of Wannemacher as to the Cavaliers' counterclaim of diminution in the value of the stock. That ruling is not being challenged on appeal. The court did not rule on either of the Cavalier's JNOV motions.
 {¶ 42} It is from the July 31, 2003 judgment entry that Wannemacher appeals, presenting three assignments of error for our review.
 Assignment of Error No. I
The Trial Court abused its discretion and erred in its determination not to accept the jury verdict on the equitable remedy of rescission after the court had denied defendant's motion for judgment of dismissal at the close of all the evidence, charged the jury, received a verdict, discharged the jury, and then effectively granted defendant-appellees (sic.) oral motion for judgment notwithstanding the verdict which is contrary to law.
 Assignment of Error No. II
The Trial Court erred in substituting its judgment for that of the jury thereby usurping the plaintiff-appellant's constitutional right to a jury trial on all issues triable to a jury under Ohio law.
 Assignment of Error No. III
The Trial Court's judgment is against the manifest weight of the evidence and is contrary to law in that it set aside the jury verdict in favor of plaintiff Gregory Wannemacher and against defendant Donna M. Cavalier upon defendant's counterclaim.
 {¶ 43} Due to the nature of appellant's claims, we will be addressing the assignments of error out of order.
 Assignment of Error No. III {¶ 44} In the third assignment of error, Wannemacher argues that the trial court's judgment is against the manifest weight of the evidence.
 {¶ 45} In the case sub judice, the trial court entered judgment in favor of Donna upon Wannemacher's complaint for fraud and rescission. "`Rescission' amounts to the unmaking of a contract, an undoing of it from the beginning, and not merely a termination * * *." Blacks Law Dictionary (5 Ed.Rev. 1979), 1174. For a court to find grounds to order the equitable remedy of rescission, it must determine the existence of a breach so substantial and fundamental as to go to the root of the contract.Schneble v. U.S. (S.D. Ohio 1985), 614 F. Supp. 78, 83. Generally, without fraud, duress, undue influence, or mistake, one party to a contract cannot rescind or cancel it without the consent of the other party. 18 Ohio Jurisprudence 3d (1980) 219, Contracts, Section 296.
 {¶ 46} Here, Wannemacher's claim for rescission was based upon the Cavaliers' breach of the "Full Disclosure" clause. As noted above, the "Full Disclosure" clause, provided that none of the disclosures made in connection with the stock purchase agreement would contain any false statements or omissions of material facts. Thus, the rescission claim was based upon the alleged fraud on the part of the Cavaliers.
 {¶ 47} In order to maintain an action for fraud, the following elements must be proven: (1) an actual or implied misrepresentation or concealment of a matter of fact which relates to the present or past, and which is material to the transaction; (2) knowledge of the falsity or such utter disregard and recklessness toward the truth or falsity of the representation that knowledge may be inferred; (3) intent to mislead another into reliance; (4) actual, justified reliance; and (5) a resulting injury. Friedland v. Lipman (1980),68 Ohio App.2d 255, para. one of the syllabus.
 {¶ 48} In reviewing the judgment of the trial court under a claim that it is against the manifest weight of the evidence, this Court cannot substitute its judgment for that of the trial court. It is the function of the judge, as the finder of fact, to observe the demeanor of the witnesses, examine the evidence and weigh the credibility of the testimony and evidence presented.Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80. Our role is limited to a review of the record to determine if the trial court's judgment was supported by some competent, credible evidence going to all the essential elements of the case, while being guided by the presumption that the findings of the trier of fact were correct. Id.; C.E. Morris Co. v. Foley ConstructionCo. (1978), 54 Ohio St.2d 279, 280.
 {¶ 49} In its written opinion, the trial court decided that Wannemacher had failed to meet his burden on the issue of rescission. Specifically, the court's opinion focused upon Wannemacher's failure to practice "due diligence," which the court noted would equate "to what a reasonably careful person in Mr. Wannemacher's situation, with his experience and knowledge would do in determining whether to spend $392,000 for a minority share of a business such as Warehouse Express Co., Inc." (Opinion of the Court.) The court was persuaded by the size and type of business that WEC represented, as well as Wannemacher's status as a sophisticated businessman. The court noted that WEC was a "small family business in corporate form" and that "Mr. Cavalier had run it to suit himself in a manner in which he had done business for a number of years." (Id.)
 {¶ 50} Additionally, the court referred to the absence of any agreement as to how Wannemacher would run WEC, as well as the absence of a compensation package for Wannemacher, noting the absence of such left Wannemacher in "a precarious position which, expectedly, a sophisticated businessman, already the owner of a similar, if larger, business would recognize."
 {¶ 51} The court then went on to say:
The evidence, in the Court's mind, demonstrates that Mr.Wannemacher's examination of the business and the assets thereofwas somewhat cursory, limited in effect, to a walk through anddiscussion with Mr. Cavalier, his accountant (who was with thesame firm Wannemacher used) and members of Mr. Cavalier's staffand examination of the balance sheet. There was no examination ofthe books of the Company by anyone qualified to do so. Mr.Wannemacher relied upon what he was alleges he was told.
 {¶ 52} The court then individually examined each of Wannemacher's reasons for rescission. The court listed the following as Wannemacher's grounds for rescission:
1. That Mr. Cavalier concealed over $200,000 in checks,showing them on the books as paid.
2. That Mr. Cavalier concealed the fact that Slantpac was not a part of Warehouse Express.
3. That not all of the real estate used by the Corporation was in the corporations name; that Mr. Cavalier was using corporate assets for personal use and paying for the personal assets with corporate funds.
4. That the Occidental business was being terminated and that Mr. Cavalier concealed that fact.
5. That funds were being paid to Cavalier Farm Services byWarehouse Express.
The court then went on to list the following explanations as to each of the above concerns:
6. Mr. Wannemacher was told about the account and the unsigned checks before the agreement was signed.
7. Mr. Wannemacher did not ask about Slantpac. Although the tax return showed it as a wholly owned subsidiary that was merely how the accountant showed it. Mr. Cavalier did not understand the significance of it.
8. The real estate was separately owned as a matter of public record and in any event he advised Mr. Wannemacher that they were separate.
9. The Occidental business was being reduced without his knowledge. He had not been advised that they were terminating.
10. Funds were paid by Warehouse to Cavalier Farm Services, which was the employing company and payroll agent for Warehouse Express.
 {¶ 53} Additionally, the court listed several factors it considered in making its decision: (1) the court questioned whether the checkbook would not have shown the reduction for each of the checks in the drawer; (2) the court noted that there was testimony that the operating account on the balance sheet did show a negative balance; (3) the court noted that Slantpac did not show up on the balance sheet, which should have caused a reasonably prudent investor to inquire further; (4) the court noted that based on the sale being for corporate stock and not corporate assets, a prudent investor should have been concerned with asset quality and quantity, as well as a corporation's ability to generate income; (5) the court noted that the evidence demonstrated that WEC's book showed a reduction in Occidental's business and that Cavalier was not heavily involved with WEC during the time prior to the stock purchase agreement; (6) the court noted that there was no testimony by anyone from Occidental as to what had been communicated to whom and that Wannemacher was in a position to know that Occidental was reducing its business, as well as to contact Occidental on his own to inquire its future plans with WEC; (7) finally, the court noted that Cavalier Farm Services was a shell corporation, which obtained its income from WEC and other Cavalier entities, that Cavalier Farm Service's books were not in evidence and that without such evidence the court was uncertain of any other connection to Cavalier Farm Services.
 {¶ 54} The court then went on to state the following:
It is indeed unfortunate that neither party took the time andeffort to solidify the transaction fully before entering into it.There is substantial evidence of loose ends, misunderstandingsand discrepancies on both sides. The evidence demonstrates thatneither party was ready to meld at the time it occurred. Theresults, predictably, were disastrous for both sides.
 In assessing the credibility of Wannemacher and Cavalier inaccordance with the principles enunciated in the charge to thejury, the Court cannot say overall that one party is morecredible than the other. Each has substantial interest in theoutcome of the case. The court observed the demeanor of each.Each had requisite knowledge to testify about the subject matter.The testimony of each can be logically supported. The Court,after listening to five days of testimony, cannot say that thetestimony of one is clearly false and that of the other isclearly true.
 The burden of proof on the issue of rescission of the contractbased upon fraud, punitive damages and attorney fees was uponWannemacher. Although the jury found that he proved his case byclear and convincing evidence, that determination was advisoryonly. The Court upon consideration of the evidence finds that Mr.Wannemacher did not prove his case by clear and convincingevidence and therefore finds that he had not demonstrated hisright to rescission of the contract and finds in favor of DonnaCavalier on that issue. It follows, then, that Mr. Wannemacher isnot entitled to punitive damages or attorney fees and the Courtfinds so.
 {¶ 55} Finally, in its judgment entry, the court entered judgment in favor of Donna upon Wannemacher's complaint for fraud and rescission. Additionally, the court went on to order Wannemacher to pay one hundred and ninety-two thousand dollars to complete the performance of the stock purchase agreement.
 {¶ 56} Applying the above manifest weight standard to the trial court's judgment, we find that the court's judgment was clearly supported by competent, credible evidence. Based upon the evidence presented to the court, as previously set forth in this opinion, we cannot find that the trial court erred in its conclusion that Wannemacher failed to prove by clear and convincing evidence that any fraudulent misrepresentation or concealment occurred which would entitle him to rescission of the stock purchase agreement.
 {¶ 57} Accordingly, the third assignment of error is overruled.
 Assignment of Error No. I {¶ 58} In Wannemacher's first assignment of error, Wannemacher asserts that the trial court committed reversible error by not accepting the jury's verdict. Specifically, he argues that based on the trial court's procedures the court was bound by the jury's verdict.
 {¶ 59} As noted previously, Wannemacher's complaint plead rescission as a remedy for the Cavaliers' breach of the "Full Disclosure" clause. In addition to rescission, Wannemacher's complaint also prayed for the payment of two hundred thousand dollars, the price Wannemacher paid for the forty-nine shares of WEC stock. Pursuant to Article I, Section 5, of the Ohio Constitution and Section 2311.04 of the Ohio Revised Code, a demand for a monetary judgment usually entitles a plaintiff to a jury trial. However, rescission is an equitable remedy, and the Supreme Court has long held that a right to a jury trial does not exist if the relief sought is equitable rather than legal. Crossv. Ledford (1954), 161 Ohio St. 469, 475; Digital AnalogDesign Corp. v. North Supply Co. (1992), 63 Ohio St.3d 657, 662, overruled on other grounds by Zoppo v. Homestead Ins. Co.
(1994), 71 Ohio St.3d 552.
 {¶ 60} Where a case presents both a legal and an equitable claim for relief and the money demanded is "incidental and ancillary" to the equitable claim and can only be awarded if the equitable relief is granted first, then the case is predominantly an equitable action, for which no jury trial is required.Murello Const. Co. v. Citizens Home Savings Co. (1985),29 Ohio App.3d 333, 334; citing Pyromatics, Inc. v. Petruziello (1983),7 Ohio App.3d 131, 134.
 {¶ 61} Upon an initial review of the complaint, it is difficult to determine whether damages or rescission was the primary claim for relief. However, upon closer review it becomes apparent that the primary claim for relief was, in fact, equitable, because the money demanded in Wannemacher's first and second claims was "incidental and ancillary" to the equitable claim. In other words, Wannemacher has simply demanding the return of his initial investment of two hundred thousand dollars, to which he would only be entitled if rescission were granted. Accordingly, no jury trial was required.
 {¶ 62} While Wannemacher had no right to a jury trial, a jury was impaneled, heard evidence, was charged and rendered a verdict in Wannemacher's favor. There was never a pretrial determination as to the jury's role. As noted above, after the jury rendered its verdict, Wannemacher moved for a judgment on rescission and the Cavaliers' moved for a JNOV. Both motions were taken under advisement, and, in its written opinion, the trial court determined that on the issue of rescission the jury verdict was advisory only. The court then went on to find that Wannemacher had failed to prove by clear and convincing evidence that he was entitled to rescission of the stock purchase agreement based on fraud. Accordingly, the court found that Wannemacher had not demonstrated the right to rescission and rendered judgment in favor of the Cavaliers.
 {¶ 63} According to Wannemacher, based on the above trial court procedures, the court was bound by the jury's verdict. Wannemacher acknowledges that the case does involve both issues of equity and law and that the court had a duty to determine issues of equity. Additionally, Wannemacher's trial counsel acknowledged the court's duty to determine issues of equity at trial. (See Tr. Transcript 544.) However, he goes on to argue that once the court denied the Cavaliers' motion of dismissal at the close of all the evidence, charged the jury, received the verdict and discharged the jury the court was bound by the jury's verdict. We disagree.
 {¶ 64} In Dice v. Akron, Canton Youngstown R. Co. (1951),155 Ohio St. 185, overruled on other grounds at 342 U.S. 359,72 S.Ct. 312, the Ohio Supreme Court stated:
Where it is claimed that a release was induced by fraud (otherthan fraud in the factum) or by mistake, it is first necessarybefore seeking to enforce a cause of action which such releasepurports to bar, that equitable relief from the release besecured. In such an instance, the issue, as to whether the personsigning the release was induced to do so by fraud or by mistake,is an issue for determination by the court. While the court, inits discretion, may submit that issue to the jury under properinstruction, the finding of the jury in respect thereto is notbinding upon the court.
Id. at 191-192 (citations omitted.) Further, the Court went on to note:
In the instant case, the trial court did submit to the jurythe issue as to whether the plaintiff was induced by fraudulentrepresentation of the defendant or by mistake to execute therelease. After the verdict of the jury, the court recognized itsresponsibility to determine that issue. The court was not boundby the jury's finding on that issue for the plaintiff.
Id. at 192.
 {¶ 65} Accordingly, the trial court was clearly not bound by the jury's verdict. The issue of rescission was an issue for determination by the court, and regardless of the court's ruling on prior motions, charging the jury, receiving the verdict and discharging the jury, the court still had the authority to rule on that issue.
 {¶ 66} Consequently, Wannemacher's argument that the court bound itself to the jury verdict through its actions is clearly without merit. Thus, the first assignment of error is overruled.
 Assignment of Error No. II {¶ 67} In the second assignment of error, Wannemacher contends that he was denied his constitutional right to a jury trial on all issues which could have been tried to a jury under Ohio law. Specifically, Wannemacher argues that even if the trial court was authorized to rely upon the jury in an advisory capacity only, as to the issue of rescission, there were additional issues that should have been decided by the jury.
 {¶ 68} As alluded to above, the court was authorized to make a determination on all issues decided in this case, including all issues of damages, because such issues were "incidental and ancillary" to the issue of rescission. To determine this issue, we start with the specific claims plead by Wannemacher.
 {¶ 69} As noted above, Wannemacher's complaint raised issues of breach of contract and fraud. In claims one and two of the complaint he prayed for money damages, and in the third claim he prayed for rescission of the stock purchase agreement.
 {¶ 70} Again, Wannemacher's claims, both for damages and for rescission, were based upon the Cavaliers' breach of the "Full Disclosure" clause of the stock purchase agreement. The "Full Disclosure" clause provided that none of the disclosures made in connection with the stock purchase agreement would contain any false statements or omissions of fact. According to the complaint, the Cavaliers' representations made, pursuant to the "Full Disclosure" clause, "were false when made" and "material facts were not disclosed[;]" the Cavaliers "knew and intended at the time of preparation and issuance of the statements of the financial of the financial condition of [WEC], as prepared and warranted by them, that this information would come to the attention of and be read by and relied upon by [Wannemacher] in the purchase of the stock as provided for in the Agreement[;]" the Cavaliers' false representations and omissions were made with the purpose of concealing WEC's true stock value; Wannemacher relied upon the Cavaliers' false representations and omissions in making his determination to enter into the stock purchase agreement; and, if Wannemacher had known about the false representations and omissions, he would not have entered into the stock purchase agreement.
 {¶ 71} Essentially, Wannemacher's claim of actual fraud was based upon what he claimed to be the Cavaliers' breach of the "Full Disclosure" clause.
 {¶ 72} As discussed above, the court's finding on the issue of rescission was sufficiently supported by competent, credible evidence. Thus, not only was the court authorized to make the decision on rescission, but that decision was also legally sufficient. Based on that conclusion, it follows that Wannemacher's claim for damages must also fail. Essentially, because Wannemacher's claim for damages was based upon the Cavaliers' breach of the "Full Disclosure" clause, once the court determined that the Cavalier's had not breached the contract, which included their not breaching the "Full Disclosure" clause, there could be no basis for any other claims. Because Wannemacher alleged no other breach of contract other than the breach of the "Full Disclosure" clause, there could be no fraud, either equitable or legal.
 {¶ 73} Additionally, the court was authorized to order Wannemacher to make a payment on the contract of one hundred ninety-two thousand dollars, because the recovery of such damages was incidental to the court's finding on the issue of rescission.Pryomatics, 7 Ohio App.3d at 134. In other words, having found no breach of contract, the court was under a duty to order performance upon that contract. Accordingly, the court was authorized to order the payment of the balance of the contract.
 {¶ 74} Thus, having found that the trial court was authorized to determine all issues incidental to the equitable remedy of rescission and that the court's findings on those issues are legally sufficient, Wannemacher's second assignment of error must fail. Accordingly, the second assignment of error is overruled.
 {¶ 75} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
 Shaw, P.J., and Bryant, J., concur.