DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Four Seasons Marketing Corp, et al., has appealed from a judgment of the Summit County Court of Common Pleas that found in favor of Plaintiff-Appellee Patio Enclosures, Inc. on its claims of tortious interference with a contract and misappropriation of trade secrets. This Court affirms.
 I {¶ 2} In 2002, Plaintiff-Appellee Patio Enclosures, Inc. ("PEI") filed a complaint against Defendant-Appellant Four Seasons Marketing Corp. ("Four Seasons") for tortious interference with a contract and misappropriation of trade secrets. Four Seasons filed a timely answer and discovery and pre-trial motions ensued. On August 23, 2004, a jury trial commenced and the jury subsequently found in favor of PEI. The jury awarded PEI $20,000 in actual damages and $1,000,000 in punitive damages on the tortious interference claim, $2,600,000 in actual damages and $5,000,000 in punitive damages on the misappropriation of trade secrets claim.
 {¶ 3} On September 9, 2004, Four Seasons filed motions for judgment notwithstanding the verdict and for a new trial, or in the alternative, for remittitur. Both parties filed briefs on Four Seasons' motions and the trial court heard arguments on the matter. On December 16, 2004, the trial court denied Four Seasons' motions for judgment notwithstanding the verdict and for a new trial, or in the alternative, for remittitur.
 {¶ 4} Asserting seven assignments of error, Four Seasons has timely appealed the judgment of the trial court in favor of PEI and the trial court's rulings on Four Seasons' post-judgment motions. For ease of analysis, we have consolidated Four Seasons' first and second assignments of error.
 II Assignment of Error Number One
"AS A MATTER OF LAW, PEI FAILED TO PROVE ANY OF THE THREE ELEMENTS OF ITS TRADE SECRETS CLAIM."
 Assignment of Error Number Two
"THE TRIAL COURT SHOULD HAVE ENTERED JUDGMENT NOV ON THE TORTIOUS INTERFERENCE CLAIM BECAUSE THERE WAS NO EVIDENCE ON INTENTIONAL PROCUREMENT OF THE BREACH."
 {¶ 5} In its first assignment of error, Four Seasons has argued that the trial court erred in denying its judgment notwithstanding the verdict motion because PEI failed to establish a valid trade secrets claim. Specifically, Four Seasons has argued that PEI did not demonstrate a recognized trade secret, misappropriation, or damages. We disagree.
 {¶ 6} In its second assignment of error, Four Seasons has argued that the trial court should have granted its motion for judgment notwithstanding the verdict on PEI's tortious interference claim. Specifically, Four Seasons has argued that PEI failed to establish the requisite element of intentional procurement of the contract breach. We disagree.
 {¶ 7} An appellate court reviews a trial court's ruling on a motion for judgment notwithstanding the verdict pursuant to Civ.R. 50(B) de novo. Cooperider v. Parker, 9th Dist. No. 02CA0065-M, 2003-Ohio-4521, at ¶ 32, citing Schafer v. RMS Realty (2000), 138 Ohio App.3d 244, 257-58. When considering a motion for judgment notwithstanding the verdict, a court construes the evidence and all reasonable inferences most strongly in favor of the nonmoving party. Posin v. A.B.C. Motor Court Hotel
(1976), 45 Ohio St.2d 271, 275. Our review does not involve weighing the evidence. McComis v. Baker (1974), 40 Ohio App.2d 332, 334-35. Rather, if we find substantial evidence to support the non-moving party's side of the case, upon which reasonable minds might reach different conclusions, the motion was properly denied. Posin, 45 Ohio St.2d at 275.
TRADE SECRETS CLAIM
 {¶ 8} Four Seasons has alleged that it was entitled to judgment notwithstanding the verdict because PEI failed to establish its trade secrets claim. PEI has responded that it proved that its business and the "way [they] do business" is a trade secret. Specifically, PEI has claimed that its researched and practiced methods of how to implement business concepts and strategies constitute trade secrets. PEI has also argued that trial testimony established misappropriation and damages.
 {¶ 9} Ohio adopted the Uniform Trade Secrets Act in 1994, which defines a trade secret as:
"[I]nformation, including the whole or any portion or phrase of any * * * business information or plans, financial information, or listing of names, addresses, or telephone numbers that satisfies both of the following:
"(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
"(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."
 {¶ 10} The determination of whether or not particular information qualifies as a trade secret is "a question of fact to be determined by the trier of fact upon the greater weight of the evidence." Fred SiegelCo., L.P.A. v. Arter Hadden (1999), 85 Ohio St.3d 171, paragraph six of the syllabus.
 {¶ 11} The following factors are considered when analyzing a trade secret claim:
"(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information." State ex rel. The Plain Dealer v. Ohio Dept. of Ins.
(1997), 80 Ohio St.3d 513, 524-525, citing Pyromatics, Inc. v.Petruziello (1983), 7 Ohio App.3d 131, 134-135.
 {¶ 12} Pursuant to R.C. 1333.61(B), misappropriation means "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[.]" R.C. 1333.61(B)(1).
 {¶ 13} Pursuant to R.C. 1333.63(A), "a complainant in a civil action is entitled to recover damages for misappropriation. Damages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." R.C. 1333.63(A)
TORTIOUS INTERFERENCE CLAIM
 {¶ 14} To recover for a claim of tortious interference with a contract, "one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." Kenty v. Transamerica Premium Ins. Co., (1995),72 Ohio St.3d 415, 419. Four Seasons has limited its appellate argument on this issue to a lack of the third element of the test, intentional procurement. PEI has responded that the following evidence demonstrates intentional procurement: 1) Cheney was offered employment with nine months remaining on his non-compete contract, which induced him to breach the agreement; 2) Four Seasons "pilfered confidential, trade secret information from [Cheney], all the while holding a job offer in the balance"; 3) Four Seasons "required [Cheney] to use, and rewarded him with a bonus incentive plan for using, the information he had learned at PEI, thereby inducing him to breach his confidentiality agreement"; and 4) Four Seasons knowingly mislead PEI about its connection to Cheney and then ignored PEI's letter informing Four Seasons that Cheney was subject to two separate non-compete and confidentiality agreements.
TRIAL TESTIMONY
 {¶ 15} During the trial on the instant matter, the jury heard from several live witnesses, watched video-taped depositions of some witnesses, and heard a reenactment of a deposition.
 {¶ 16} Anthony Russo ("Russo"), director of franchise compliance for Four Seasons and employee of the company since 1983, testified to the following on cross-examination. In the past, 90-95% of Four Seasons' business was through franchises or dealers, not company-owned branch locations, but at the time of trial, Four Seasons owned and operated five retail stores in North America.[1] On November 19, 2001, Russo received a letter and resume from Joe Cheney ("Cheney"), which documented Cheney's work at PEI. Russo called Cheney that day and kept a phone log, which reflects him calling Cheney, leaving a message, and receiving a returned call from Cheney less than an hour later. Russo and Cheney discussed Cheney's non-compete agreement, but Russo could not remember if they discussed a confidentiality agreement; Russo's phone log notes contained a notation that Cheney had nine months left on his non-compete clause. Russo also remembered Cheney saying he was wrongfully terminated. Russo never asked to look at Cheney's non-compete agreement from PEI and did not talk to the president of Four Seasons or any lawyers about it; Russo did however, tell Jeffrey Trimboli, of Four Seasons, about Cheney's non-compete agreement. Even though Russo had hired two other former PEI employees, he denied knowing that PEI utilized non-compete and confidentiality agreements with their employees. When asked about a specific employee, Mr. McGuigan, Russo admitted that he knew that employee had a non-compete agreement with PEI and that PEI sued Mr. McGuigan for violating the agreement. Russo knew that PEI was serious about enforcing its non-compete agreements, but never contacted PEI about Cheney's non-compete agreement.
 {¶ 17} Russo continued testifying to the following. On December 10, 2001, he and Cheney talked about PEI having 300 leads per salesman (with 100 self-generated and 200 corporate-generated), its in-house installers, and its door hanger programs. Prior to Russo's conversations with Cheney he did not know about PEI's three percent management fee system. On December 11, 2001, Cheney met with Russo at Four Seasons' New York offices. Cheney was subsequently hired to be the Midwest regional manager of Four Seasons; he signed a confidentiality agreement and he requested that the company not send out announcements publicizing his employment with the company. Part of Cheney's job description with Four Seasons was to have complete knowledge of competitive manufacturers and how they market their products. After Cheney began working at Four Seasons, it received a letter from PEI stating that Cheney's non-compete agreement was still in place. Between the time Cheney was hired by Four Seasons and the end of 2005, Four Seasons will have expanded the retail operation of its company ten fold.
 {¶ 18} Jeffrey Trimboli ("Trimboli"), vice-president of sales for Four Seasons, testified to the following via video-taped deposition. Trimboli was Cheney's supervisor at Four Seasons from the time Cheney was hired in December 2001 until he was forced to resign as a result of an injunction obtained by PEI. Since the summer of 2002, Four Seasons has worked to expand its business by opening company-owned locations. Trimboli knew that Cheney had worked at PEI for eight years and had been a regional manager of sales and a manager of branch development. Trimboli confirmed that Russo informed him of Cheney's non-compete and confidentiality agreement with PEI and Trimboli never asked to review it or referred the issue to a lawyer to determine if the agreement was valid. Cheney told Trimboli that he had worked for two other patio enclosure companies since PEI, that he was wrongfully terminated from PEI and was suing the company for wrongful dismissal. Trimboli admitted not verifying Cheney's statements. Trimboli did not call PEI to inquire about possible objections over Four Seasons interviewing Cheney. When asked if he thought PEI would object to Four Seasons interviewing Cheney, Trimboli responded "Anybody would." Trimboli knew that Cheney's non-compete agreement was for a two-year period and a 50-mile radius of any PEI location and Cheney's Four Seasons office was within the 50-mile radius. Cheney's employment included a bonus program with bonuses increasing with increased sales. Cheney did very well at increasing Four Seasons' sales. Trimboli knew about the letter from PEI stating that Cheney was still under the non-compete agreement. As part of his duties with Four Seasons, Cheney was responsible for listing target markets, which included areas where PEI had locations. Cheney informed Four Seasons that a sales training video was needed, that Four Seasons needed a three-season room to compete against PEI, and he instructed Four Seasons' dealers and franchises how they could better compete with PEI.
 {¶ 19} Robert Schneider ("Schneider"), chairman and chief executive officer of PEI, testified to the following. The patio enclosure or sunrooms business is a niche industry. Starting around 1969, PEI began marketing their product directly to the consumer and developed a system to market in managed locations. PEI's national competitors are Four Seasons, Champion, and TEMO. PEI started with company locations where it developed a system of sales training manuals, operations manuals, and computer programs specifically for retail business. Prior to 2001, Four Seasons "went to market" with franchises and dealers and did not focus on company owned stores.
 {¶ 20} Schneider continued testifying to the following. He "consider[s] [PEI's] whole business system to be a trade secret[;]" PEI has spent millions of dollars in developing their system and perfecting it. If a competitor obtains PEI's business system, the competitor saves money because it is not going to waste money developing a system, the competitor will also have quicker growth, and the competitor will take business away from PEI. From 1987 to 2004, PEI has invested "in excess of $12 million" in developing its business system. A major component of PEI's confidential business system is the three percent management fee, which provides each location access to an in-house advertising agency, accounting department, purchasing department, and IT department, all of which assist the locations in running their business. Another confidential component of PEI is the use of in-house crews for installation, rather than sub-contractors. The commission system at PEI is also unique and confidential. Schneider reviewed Russo's notes from his conversation with Cheney and recognized the following notations on elements of PEI's business system: the three percent management fee; system of marketing and advertising; commission program; use of in-house crews; a budget program; the 300 lead program; and a "Hang 10" program for door installers. The information in Russo's notes contained confidential information that was not available in the public domain. PEI derives an economic benefit from the information contained in the notes because that is the way they have determined to best run their business and make money. PEI goes to "extreme efforts to keep everything secret and confidential." All employees must agree to a confidentiality agreement and certain employees, like Cheney, are required to sign non-compete and confidentiality agreements. PEI also has "sophisticated alarm system[s]" in their locations, which restrict access to certain areas. Certain meetings are also restricted to those who have signed the non-compete and confidentiality agreements.
 {¶ 21} Schneider's testimony continued as follows. Cheney had access to all PEI records and programs, which were not available in the public domain. As a condition of his employment Cheney was required to sign a non-compete and confidentiality agreement; Cheney signed the agreement a couple of weeks before he was hired by PEI. The agreement prohibited Cheney from working for any competitor located or doing business within a 50-mile radius of any of the PEI locations and required him to keep confidential anything that he learned about PEI from his employment. The agreement contained the following non-exhaustive list of the type of information that Cheney was prohibited from disclosing: information relating to marketing techniques, advertising, scheduling, and media mix; pricing, sales, installation, manufacturing, office, and personnel policies and procedures; training programs; computer software; and technical product information. Schneider considered everything in the agreement to be trade secrets. All employees are required to sign a confidentiality agreement. Cheney signed a second non-compete agreement when PEI offered a stock appreciation bonus agreement. The second agreement restricted Cheney from "directly or indirectly, own[ing], operat[ing], be[ing] employed by or ha[ving] any interest in any business that sells, offers for sale, licenses or franchises others to sell" patio rooms. Cheney was free to work at any company that did not compete with PEI. Four Seasons operates within a 50-mile radius of PEI and is a direct competitor of PEI. Cheney's employment with Four Seasons was a direct violation of the non-compete and confidentiality agreement.
 {¶ 22} Schneider continued his testimony, testifying to the following. Upon Cheney's termination in September 2000, he requested to be released from his non-compete agreement and PEI declined his request. In March of 2002, Schneider was at a National Sunroom Association conference eating with the then-president of Four Seasons, Mr. Lucier; Mr. Lucier asked Schneider if he knew Cheney. Schneider answered in the affirmative, stated that he thought Cheney was still under a non-compete agreement with PEI, and informed Mr. Lucier that he would get back to him about Cheney's non-compete agreement status. When Schneider returned from the conference he confirmed that Cheney was still under a non-compete agreement, wrote Mr. Lucier informing him of the active agreement, and sent him copies of both non-compete agreements Cheney had signed while employed at PEI. The letter informed Four Seasons that if Cheney was employed with them before the expiration of the agreement on September 18, 2002, PEI's "legally protected interest * * * would be impaired." Neither Mr. Lucier nor Four Seasons responded to Schneider's letter. In early May of 2002, Schneider learned that Cheney was working at Four Seasons. As a result of Four Seasons' acts, PEI has incurred $20,839.74 in attorney's fees pursuing the enforcement of Cheney's non-compete agreement, and has had to pay for transcripts and depositions. PEI invested $535,000 in Cheney and 30% in benefits to teach him the information that he then gave to Four Seasons. PEI also invested $12 million in its business system.
 {¶ 23} Schneider testified to the following on cross-examination. He considers PEI's "whole selling process * * * a trade secret." Schneider did not witness Cheney leave PEI with any documents and he did not hear that Cheney stole documents. Schneider had no evidence that Four Seasons was using the three percent management fee. While franchises and in-house installers may not be a trade secret by themselves, the way PEI operates as a whole is a trade secret.
 {¶ 24} Schneider testified to the following on re-direct-examination. The damages request for $12 million is a reasonable estimate of what PEI spent researching and developing its business system and a reasonable estimate of what Four Seasons saved by Cheney's disclosure of PEI's trade secrets.
 {¶ 25} On re-cross-examination, Schneider testified that he had not seen Four Seasons' financial records, but that they saved the cost of research and creating the infrastructure, which is the key to PEI's business system.
 {¶ 26} The jury heard the following testimony from a reenactment of Cheney's May 20, 2003 deposition testimony. Opening a store for PEI was "pretty similar" to the process Cheney utilized when opening stores for his prior employers. The sales training Cheney encountered at PEI was "similar" to his previous training at other companies. After being terminated from PEI, Cheney worked at Traco, a window and sunroom manufacturer. PEI did not know Cheney was working at Traco. Cheney then went to Thermal-Guard, a vinyl replacement window and sunroom manufacturer; he did not recall if PEI knew he worked at Thermal-Gard.
 {¶ 27} Cheney's testimony continued as follows. Cheney contacted Russo at Four Seasons about potential employment. During his first conversation with Russo, Russo asked Cheney if he had a non-compete and nondisclosure agreement with PEI and Cheney answered in the affirmative. Cheney later informed Four Seasons that he had an attorney look at the agreement and based on Cheney's interpretation of his firing, the attorney told him he could look for a job. At Four Seasons, Cheney was dealing strictly with franchises and dealers; he had no involvement in the company owned stores. At PEI Cheney dealt only with the company owned stores. No one from Four Seasons ever asked him about PEI's financial or product information, customer lists, or policies or business methods; Cheney denied ever disclosing such information. He could not think of any trade secrets he stole and gave to Four Seasons.
 {¶ 28} Cheney's deposition testimony contained the following cross-examination. Four Seasons volunteered to pay and did pay half of his attorney's fees from PEI's suit against him. Four Seasons hired Cheney despite their knowledge of his non-compete agreement with PEI and it never asked for a copy of the non-compete agreement. Cheney could not remember if he actually told Four Seasons that he consulted an attorney about his non-compete agreement. Cheney could not recall informing Russo of PEI's lead program, but admitted that if it was in Russo's notes from their conversation then it appears he did say something. Cheney did not clearly answer whether he told Russo about the in-house installers or the "Hang 10" program. Cheney did not remember if he informed Russo about PEI's process for setting up branch locations. He admitted that Russo's notes contain a structure of how PEI sets up its branch locations. He also admitted asking Russo to refrain from making a public announcement about his employment with Four Seasons. Cheney's position at Four Seasons included expanding the revenues in the geographic territory he covered and having complete knowledge of his competitors, which included PEI. Cheney admitted that had he not worked for PEI he would not have had exposure to profit and loss information at branch locations, cost information on the products sold at those locations, or access to advertising and media mix schedules for those locations.
 {¶ 29} On re-direct examination Cheney recalled telling Four Seasons that he believed his termination was unlawful.
 {¶ 30} Lawrence J. Dulay ("Dulay"), chief financial officer of PEI, testified to the following for PEI. Dulay was asked to develop a damages amount for the instant matter based on PEI's investment in its branch business system. Starting the calculation in 1987, the year he began at PEI and had control of its financial records, Dulay determined that the best estimate for PEI's branch business system development costs was $12,019,699. Dulay also believed that amount represented what a competitor would save if they knew about PEI's system.
 {¶ 31} Dulay testified on cross-examination that he had no personal knowledge that PEI had been damaged to the amount of $12 million dollars.
 {¶ 32} David Robert Aitken ("Aitken"), chief operational officer of Four Seasons, testified to the following via video-taped deposition. Aitken knew that PEI sent Russo a letter about Cheney's non-compete and confidentiality agreement and that Four Seasons did not inquire further or take any action. Based solely on Cheney's statements, Aitken believed that the agreement was invalid. Aitken confirmed that Four Seasons paid a large portion of Cheney's attorney's fees from PEI's lawsuit.
 {¶ 33} Marc Fox ("Fox"), vice-president of PEI's sunroom marketing division, testified to the following. Fox reiterated the previous testimony about the history and components of the PEI business system and the methods used to maintain confidentiality of the system. When Fox examined Russo's notes from his conversation with Cheney, Fox immediately concluded that Cheney had violated his non-compete and confidentiality agreement. Fox believed that while some components of PEI's system are general business practices, their implementation and connection to other components make PEI's system unique. Specifically, Fox considered the following components unique to PEI: the ratio of self-generated to corporate leads for salesman; general manager also being the sales manager; managers that sell products; corporate control of advertising and marketing; the three percent franchise fee; and the support structure for branch locations.
 {¶ 34} Fox testified to the following on cross-examination. PEI's lead tracking system is key to its confidential business system and unique to PEI. The way PEI trains its salesman to sell based on different advertisements is also unique to PEI. Fox admitted that other than from Russo's notes he has no personal knowledge of any information Cheney conveyed to Four Seasons. Since Cheney's termination from PEI, Fox has not observed any of PEI's competitors implementing PEI's business system. The individual components of PEI's business system are not trade secrets, but become a trade secret when combined into the current PEI system. Fox has not seen Four Seasons implement PEI's business system. Fox had no first-hand knowledge of Four Seasons' post Cheney termination market share or sales impact on PEI branch locations.
 {¶ 35} David Ewing ("Ewing"), chief executive officer of Four Seasons, testified to the following via video-taped deposition. Ewing did not recall Cheney informing him of his non-compete and confidentiality agreement from PEI. When Ewing became aware of PEI's letter concerning its agreement with Cheney, he took no action because he was informed that Cheney said the agreement was invalid. Ewing admitted in prior deposition testimony that he believed it was illegal to share marketing strategy or cost or price information when one is under a non-compete and confidentiality agreement.
 {¶ 36} PEI also presented testimony from Ewing's discovery deposition that he believed Cheney was incompetent and he informed others at Four Seasons of his belief while Cheney was still working there.
 {¶ 37} Although he previously testified via video-taped deposition during PEI's presentation of evidence, Aitken testified to the following at trial for Four Seasons. He denied any suggestion that Four Seasons paid Cheney's attorney's fees in exchange for confidential information on PEI. Aitken could not attribute any increase in revenue during the time Cheney worked for Four Seasons to Cheney. Aitken denied that Four Seasons saved any money from information obtained from Cheney.
 {¶ 38} Aitken testified to the following on cross-examination at trial. If Aitken had known at the time Cheney was hired that he was under a non-compete and confidentiality agreement, he would have looked into the agreement further. Four Seasons earned $1 million more in profits the year Cheney worked there.
 {¶ 39} Trimboli testified live at trial to the following. At the time Cheney was a regional manager of Four Seasons, two other former PEI employees were also regional managers. Trimboli denied any knowledge of PEI's business system and he denied ever asking Cheney about it. Four Seasons does not have a management fee. Four Seasons has always assisted its franchise and company owned stores with advertising and leads/sales assistance and tracked leads. Cheney never told Trimboli how to use a lead ratio or the amount of leads to provide. Four Seasons did not change its sales process after Cheney was hired.
 {¶ 40} Trimboli testified to the following on cross-examination. Even though Four Seasons knew PEI had non-compete and confidentiality agreements with its employees, Four Seasons hired three former managers from PEI. Trimboli knew that PEI would seek to enforce its non-compete and confidentiality agreement with Cheney and he hired him anyway.
 {¶ 41} Russo testified to the following as a re-called witness by Four Seasons. When Cheney requested that his employment with Four Seasons not be announced Russo thought it had something to do with his non-compete agreement with PEI. The notes from his first conversation with Cheney were merely notes, not questions asked or information solicited. After he took the notes, Russo put them in a file he made on Cheney and did not make any copies or distribute the notes within Four Seasons. He did not look at the notes again until PEI sued Four Seasons. PEI sued its two other former employees who went to work for Four Seasons, but did not sue Four Seasons for hiring them.
 {¶ 42} Russo testified to the following on cross-examination. Russo was mistaken when he averred in his affidavit that Cheney's duties were immediately restricted when Four Seasons received the letter from Schneider about Cheney's non-compete and confidentiality agreement. Russo was also mistaken when he swore in his interrogatory answer that Cheney's duties were suspended when Four Seasons was informed of the PEI agreement. Russo thought the affidavit and interrogatory were referring to the temporary restraining order that was issued restraining Cheney from continuing to work for Four Seasons.
RULING
 {¶ 43} Based on the foregoing, we find that, construing the evidence in a light most strongly in favor of PEI, substantial evidence was presented, upon which reasonable minds might reach differing conclusions, to support PEI's misappropriation of trade secrets claim against Four Seasons. A reasonable jury could conclude that Four Seasons misappropriated trade secrets from PEI. Therefore, we conclude that the trial court appropriately denied Four Seasons' motion for judgment notwithstanding the verdict on PEI's misappropriation of trade secrets claim. See Posin, 45 Ohio St.2d at 275.
 {¶ 44} We also find that substantial evidence was presented, upon which reasonable minds might reach different conclusions, to support PEI's argument of intentional procurement. Construing the evidence in a light most strongly in favor of PEI, a reasonable jury could conclude that Four Seasons, specifically Russo and Trimboli, intentionally procured Cheney's breach of his non-compete and confidentiality agreement with PEI. Accordingly, we find that the trial court properly denied Four Seasons motion for judgment notwithstanding the verdict on PEI's tortious interference with a contract claim. See Posin, 45 Ohio St.2d at 275.
 {¶ 45} Based on the foregoing, Four Seasons' first and second assignments of error lack merit.
 Assignment of Error Number Three
"THE PUNITIVE DAMAGES AWARDS ARE LEGALLY FLAWED."
 {¶ 46} In its third assignment of error, Four Seasons has argued that the punitive damages awards are legally flawed and require reversal. Specifically, Four Seasons has argued that PEI relied solely on evidence unrelated to the underlying alleged torts to prove malice and PEI argued a single source of conduct which cannot support two punitive damages awards. We disagree and discuss each argument separately.
 {¶ 47} Four Seasons has alleged that the punitive damages award was based on evidence unrelated to the underlying claims. A review of the record reveals that the jury returned general verdicts and thus, it did not state on the record the basis for its punitive damages award. Moreover, the record is void of any jury interrogatories. Accordingly, this Court is without knowledge as to the testimony on which the jury based its awards of punitive damages. Therefore, we cannot find that the punitive damages awards are legally flawed.
 {¶ 48} Four Seasons has also argued that the punitive damages awards are legally flawed because they are based on a single course of conduct. PEI has argued that contrary to Four Season's assertion, it proved two illegal courses of conduct and that the verdict forms clearly delineate the two separate awards.
 {¶ 49} Four Seasons has correctly argued that when a case involves a single animus, punitive damages can only be awarded once. Specifically, "[w]hen a course of events is governed by a single animus, even though a defendant may be liable to compensate plaintiff for the damages occasioned by a number of torts committed in such course of events, a defendant may only be punished once by a single award of punitive damages." Digital Analog Design Corp. v. North Supply Co. (1989),44 Ohio St.3d 36, at syllabus. Contrary to Four Seasons' arguments we find that the instant matter involves more than a single animus. The following testimony was presented to the jury: Four Seasons offered Cheney employment even though it knew he had signed a non-compete and confidentiality agreement with PEI, which under the time period of the agreement was still in effect; Four Seasons did not investigate the agreement; it took notes during its initial conversation with Cheney about specific PEI programs and business plans; it actively mislead PEI about its relationship with Cheney; when PEI informed Four Seasons that Cheney was still under an active non-compete and confidentiality agreement with PEI, Four Seasons continued to employ Cheney and again did nothing to investigate the agreement; and it greatly expanded its company owned store operations while Cheney was employed there. Based on the foregoing, we cannot find that the evidence in the instant matter presented only a single course of conduct for the jury to award punitive damages.
 {¶ 50} Four Seasons' third assignment of error lacks merit.
 Assignment of Error Number Four
"THE VERDICTS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 51} In its fourth assignment of error, Four Seasons has argued that the verdicts were against the manifest weight of the evidence. Specifically, Four Seasons has argued that its motion for a new trial should have been granted because the verdicts constituted a miscarriage of justice.
 {¶ 52} An appellant has the burden on appeal. See App.R. 16(A)(7); Loc.R. 7(A)(7). "It is the duty of the appellant, not this court, to demonstrate his assigned error through an argument that is supported by citations to legal authority and facts in the record." State v. Taylor
(Feb. 9, 1999), 9th Dist. No. 2783-M, at 7. See, also, App.R. 16(A)(7); Loc.R. 7(A)(7). "It is not the function of this court to construct a foundation for [an appellant's] claims; failure to comply with the rules governing practice in the appellate courts is a tactic which is ordinarily fatal." Kremer v. Cox (1996), 114 Ohio App.3d 41, 60. Moreover, it is not the duty of this Court to develop an argument in support of an assignment of error if one exists. Cardone v. Cardone (May 6, 1998), 9th Dist. Nos. 18349 and 18673, at 22. As we have previously held, we will not guess at undeveloped claims on appeal. See McPhersonv. Goodyear Tire Rubber Co., 9th Dist. No. 21499, 2003-Ohio-7190, at ¶ 31, citing Elyria Joint Venture v. Boardwalk Fries, Inc. (Jan. 31, 2001), 9th Dist. No. 99CA007336. Further, this Court may disregard arguments if the appellant fails to identify the relevant portions of the record from which the errors are based. See App.R. 12(A)(2); Loc.R. 7(E).
 {¶ 53} In the instant matter, Four Seasons has merely alleged that the verdicts are against the manifest weight of the evidence. Four Seasons has failed to argue the two verdicts separately, cite relevant case law on those verdicts, or cite to the record in support of its assignment of error. Rather Four Seasons focuses on the procedure of ordering a new trial based on a manifest weight of the evidence argument. Without support for its argument that the verdicts were against the manifest weight of the evidence, this Court cannot reach the issue of whether a new trial should have been granted.
 {¶ 54} Based on the foregoing, Four Seasons has failed to meet its burden on appeal, and therefore, we elect to disregard its fourth assignment of error. See App.R. 12(A)(2); Loc.R. 7(E); Smith v. AkronDept. Public Health, 9th Dist. No. 21103, 2003-Ohio-93. Accordingly, Four Seasons' fourth assignment of error is not well taken.
 Assignment of Error Number Five
"THE TRIAL COURT'S EVIDENTIARY ERRORS REQUIRE A NEW TRIAL."
 {¶ 55} In its fifth assignment of error, Four Seasons has argued that evidentiary errors require a new trial under Civ.R. 59(A). Specifically, Four Seasons has argued that the trial court should not have allowed PEI to argue its unjust enrichment damages theory through improper lay opinion testimony or argue critical elements of its claims through testimony given in a case to which Four Seasons was not a party.
 {¶ 56} A trial court is afforded broad discretion in its determination of the propriety of a new trial pursuant to Civ.R. 59. Sharp v. Norfolk W. Ry. Co. (1995), 72 Ohio St.3d 307, 312. Accordingly, this Court reviews a trial court's ruling on a motion for a new trial for an abuse of that discretion. Brooks v. Wilson (1994), 98 Ohio App.3d 301, 304. An "`[a]buse of discretion,' in relation to the [disposition] of a motion for a new trial[,] implies an unreasonable, arbitrary or unconscionable attitude on the part of the court." (Citation omitted.) (Alterations original.) Cooperider v. Parker, 9th Dist. No. 02CA0065-M, 2003-Ohio-4521, at ¶ 29. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Berkv. Matthews (1990), 53 Ohio St.3d 161, 169.
 {¶ 57} Pursuant to Civ.R. 59:
"A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:
"(1) Irregularity in the proceedings of the court * * * or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;
"(2) Misconduct of the jury or prevailing party;
"(3) Accident or surprise which ordinary prudence could not have guarded against;
"* * *;
"(7) The judgment is contrary to law;
"* * *;
"(9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application[.]" Civ.R. 59(A).
 {¶ 58} Four Seasons has alleged that two evidentiary errors of the trial court require a new trial under Civ.R. 59. A trial court possesses broad discretion with respect to the admission of evidence. State v.Maurer (1984), 15 Ohio St.3d 239, 265, certiorari denied (1985),472 U.S. 1012, 105 S.Ct. 2714, 86 L.Ed.2d 728. An appellate court will not disturb evidentiary rulings absent an abuse of discretion. State v.Roberts, 156 Ohio App.3d 352, 2004-Ohio-962, at ¶ 14. As previously discussed, an abuse of discretion is a "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio State Med. Bd.
(1993), 66 Ohio St.3d 619, 621. We will not substitute our judgment for that of the trial court. Id.
SCHNEIDER AND DULAY'S TESTIMONY
 {¶ 59} Four Seasons has argued that the trial court erred in allowing Schneider, chairman and chief executive officer of PEI, and Dulay, chief financial officer of PEI, to give lay opinion testimony regarding the cost of PEI's business system and Four Seasons' savings from not having to develop the business system itself. PEI has responded that the trial court did not abuse its discretion in allowing Schneider and Dulay's testimony because the testimony fulfilled the foundational requirements of Evid.R. 701.
 {¶ 60} Under Evid.R. 701, a lay witness can give opinion testimony if the witness' opinion is rationally based upon such witness' perception and it is helpful in providing a clear understanding of the testimony of the witness or a determination of a fact at issue. Evid.R. 701.
 {¶ 61} Schneider, CEO of PEI since 1980 and a member of the founding family of the company, testified that Four Seasons requested PEI create a documented estimate of the costs of creating and implementing PEI's business system. Schneider enlisted Dulay to develop the estimate and assisted him in the process. Schneider testified that PEI invested $12 million into the development and implementation of its business system. He testified that the $12 million was an estimate; Four Seasons did not object to this testimony. Four Seasons' failure to object to Schneider's testimony on the costs of the business system resulted in it waiving all but plain error on the issue on appeal. See Matis v. Matis, 9th Dist. No. 04CA0025-M, 2005-Ohio-72, at ¶ 18. As Four Seasons did not argue plain error on this issue, its argument that the trial court erred in allowing Schneider to testify on the cost of developing PEI's business plan is not well taken. Id.
 {¶ 62} Four Seasons did however object to Schneider testifying to the amount Four Seasons saved from not having to develop the business system itself. Specifically, Four Seasons objected based on foundation grounds, not improper lay opinion testimony under Evid.R. 701. Evid.R. 103(A)(1) provides that error may be predicated on a ruling that admits evidence unless a substantial right is affected and "a timely objection * * * appears of record stating the specific ground of the objection[.]" Although Four Seasons raised an objection to the admissibility of Schneider's testimony concerning Four Seasons' savings, it was not on the same grounds it now raises on appeal. This Court "need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court."State v. Williams (1977), 51 Ohio St.2d 112, paragraph one of the syllabus, vacated in part on other grounds (1978), 438 U.S. 911,98 S.Ct. 3137, 57 L.Ed.2d 1156. Because Four Seasons failed to preserve this issue for appellate review, its argument lacks merit. See State v.Hutzler, 9th Dist. No. 21343, 2003-Ohio-7193, at ¶ 10.
 {¶ 63} A review of the record reveals that Dulay, a CPA, who first began at PEI in 1987 as a corporate controller, had been working as CFO of PEI since 1990. He explained that based on his "hands-on experience" with the financial history of the company, he developed a damage estimate of the cost incurred to develop PEI's business system. He described his method for developing the estimate and provided documentation to support the amount. In regards to the cost of the business system or the amount Four Seasons saved, Dulay testified to "estimate[s]" and a "reasonable amount[s]." Moreover, he did not testify as an expert. He admitted that he had no personal knowledge that PEI was damaged to the tune of $12 million, rather he provided that amount as an estimate of what PEI's business system, which Four Seasons allegedly misappropriated, cost to develop. The record shows that Four Seasons thoroughly cross-examined Dulay.
 {¶ 64} Based on the foregoing, we find that Dulay's testimony was permissible under Evid.R. 701. Dulay was familiar with PEI's financial history and the costs related to its business system. His familiarity made him particularly qualified to state an opinion on an estimate of the cost of PEI's business system and what another company would save if they were to obtain such a system. His testimony was rationally based on his perception and helpful in providing a clear understanding of a fact at issue. See Evid.R. 701. Accordingly, Four Seasons' argument lacks merit.
CHENEY'S PRELIMINARY INJUNCTION HEARING TESTIMONY
 {¶ 65} In its second argument for a new trial based on evidentiary errors Four Seasons has argued that Cheney's testimony from a preliminary injunction hearing should not have been admitted into evidence. PEI has responded that the testimony was properly admitted because it was admissible under Evid.R. 804(B)(1) and (3).
 {¶ 66} "A reviewing court cannot consider an exhibit unless the record demonstrates that the exhibit was formally admitted into evidence in the lower court." Cardone v. Cardone (May 6, 1998), 9th Dist. Nos. 18349 and 18673, at 3, citing State v. Ishmail (1978), 54 Ohio St.2d 402. See, also, Moore v. Nichol (Oct. 30, 1991), 9th Dist. No. 15062, at 9 (holding that the "[appellate] court cannot consider an exhibit absent a sufficient showing that it was formally admitted into evidence.").
 {¶ 67} Upon review of the record, we find that Cheney's testimony in the proceeding for a preliminary injunction in a separate case, which testimony Four Seasons has argued was erroneously admitted by the trial court, was not formally admitted into evidence. While a transcript of the hearing was included in the evidence box and listed under "Also Included" in the trial transcripts, it was not identified, marked, or admitted as an exhibit during the trial. The trial transcripts reveal that the court heard argument on the hearing testimony prior to the start of trial and ruled that he would "allow" it, but the hearing testimony was never actually admitted into evidence. The hearing testimony is also not included in PEI's exhibit book of marked and admitted exhibits. Moreover, while the jury did hear a reenactment of Cheney's deposition testimony, the hearing testimony was not read into evidence. We find that because the preliminary hearing testimony was not formally admitted as an exhibit Four Seasons' argument that said testimony was erroneously admitted lacks merit. See Cardone at 3.
 {¶ 68} Based on the foregoing, we find that the trial court did not abuse its discretion in admitting lay opinion testimony and that Four Seasons' argument concerning the preliminary hearing testimony has no merit. It follows that this Court cannot find that the trial court abused its discretion in denying Appellants' motion for a new trial based on evidentiary errors. Accordingly, Four Seasons' fifth assignment of error is not well taken.
 Assignment of Error Number Six
"THE PUNITIVE DAMAGES JURY INSTRUCTIONS VIOLATED OHIO LAW."
 {¶ 69} In its sixth assignment of error, Four Seasons has argued that the jury instructions on punitive damages were defective. Specifically, Four Seasons has argued that the instructions violated the law for two reasons: 1) "the instructions allowed the jury to base punitive damages on allegedly `malicious' acts unconnected to the injury-causing conduct and contrary to statute and 2) "the `egregious fraud' instruction allowed the jury to base punitive damages on fraud, even though no fraud was ever alleged." While Four Seasons has not directly admitted that it failed to object to the punitive damages jury instruction at trial, it has argued plain error on appeal. We disagree.
 {¶ 70} A review of the record reveals that Four Seasons did not object to the trial court's punitive damages jury instruction and that Four Seasons declined the trial court's invitation at the conclusion of the punitive damages jury instruction to comment on the record regarding the instruction. The record also shows that PEI included the complained of jury instruction in its proposed jury instructions, which were filed with the trial court and provided to Four Seasons on August 16, 2004, well before the trial date. Absent plain error, a party waives any challenge to jury instructions in a civil case unless that party "objects before the jury retires to consider its verdict, stating specifically the mater objected to and the grounds of the objection." Civ.R. 51(A). Because Four Seasons failed to object to the allegedly erroneous jury instruction, this Court must determine if the trial court's punitive damages jury instruction constituted plain error.
 {¶ 71} A plain error is one that is "obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings." Schade v. Carnegie Body Co. (1982),70 Ohio St.2d 207, 209. Plain error occurs when, but for the error, the outcome of the trial clearly would have been otherwise. Doyle v.Fairfield Machine Co., Inc. (1997), 120 Ohio App.3d 192, 214. In civil matters,
"the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." (Emphasis omitted.) (Citations omitted.) Goldfuss v. Davidson
(1997), 79 Ohio St.3d 116, syllabus.
 {¶ 72} Four Seasons has failed to demonstrate such exceptional circumstances exist in the instant case. The plain error doctrine should not be applied to reverse a civil judgment in order to allow the presentation of issues which could have easily have been raised and determined in the initial trial. See Goldfuss, 79 Ohio St.3d at 122. Four Seasons has alleged that the punitive damages jury instruction, to which it had at least three opportunities to object, constituted plain error because it allowed the jury to base damages on malicious acts and/or egregious fraud. As previously discussed in assignment of error number three, the record does not state the basis for the jury's punitive damages award and the record is void of any jury interrogatories. Accordingly, this Court is without knowledge of the testimony the jury considered when it awarded punitive damages or the portion of the instruction that it relied on when making its decision. Therefore, we cannot say that, but for the punitive damages jury instruction, the outcome of the trial clearly would have been otherwise. Based on the foregoing, Four Seasons has failed to establish plain error.
 {¶ 73} Four Seasons' sixth assignment of error lacks merit.
 Assignment of Error Number Seven
"THE TRADE SECRETS AND PUNITIVE DAMAGES AWARDS ARE EXCESSIVE AND THE RESULT OF PASSION AND PREJUDICE."
 {¶ 74} In its seventh assignment of error, Four Seasons has argued that the trial court should have granted its motion for a new trial because the damages awards were based on passion and prejudice. Specifically, Four Seasons has argued that PEI introduced no admissible evidence concerning the amount Four Seasons saved by allegedly obtaining PEI's business system. Four Seasons has argued in the alternative, that if passion and prejudice are not found, the trial court erred in denying its motion for remittitur because the damages awards are unwarranted and excessive.
 {¶ 75} PEI was awarded actual and punitive damages on both of its claims against Four Seasons. The trade secrets claim is statutory based and the tortious interference with a contract claim is tort based; as such, each claim involves separate and distinct damage provisions. In the instant assignment of error, Four Seasons has argued generally that the awards are based on passion and prejudice and excessive. While Four Seasons has cited some facts it believes support its argument and provided general case law on passion and prejudice and excessive jury awards, it has failed to provide the proper foundations in case law and statute that provide for damages under PEI's claims. Four Seasons has failed to argue with specificity the respects in which each damages award was not in accordance with the applicable case law or statute. As previously discussed in our analysis of Four Seasons' assignment of error number four, it is not the duty of this Court to develop an argument in support of an assignment of error. Cardone, at 22.
 {¶ 76} Based on the foregoing, we find that Four Seasons failed to meet its appellate burden and disregard Four Seasons' seventh assignment of error. See. App.R. 12(A)(2); Loc.R. 7(A)(7). Accordingly, Four Seasons' seventh assignment of error lacks merit.
 III {¶ 77} Four Seasons' seven assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellants.
Exceptions.
Batchelder, J. Moore, J. concur
[1] Ultraframe bought Four Seasons in July of 2001 and is Four Seasons' parent company; several of the company's upper level employees remained after Ultraframe became the parent company.